**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Brennan James CALLAN,
Defendant–Appellant.**

No. 99–5934.

United States Court of Appeals,
Sixth Circuit.

Oct. 15, 2001.

Before RYAN and BATCHELDER, Circuit Judges; and MATIA *, Chief District Judge.

PER CURIAM.

Defendant, Brennan James Callan, was tried, convicted, and sentenced for tampering with a vessel of the United States with the intent to injure or endanger the safety of the vessel in violation of 18 U.S.C.

* The Honorable Paul R. Matia, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

§ 2275. He raises numerous issues on appeal. Because we find no merit to Callan's claims, we affirm.

This case involves the sinking of the *Belle of Louisville* ("the *Belle*"), the historic river steamboat docked at a wharf along the Ohio River in Louisville, Kentucky. On Saturday, August 23, 1997, the *Belle* arrived back in port following an evening adult dance cruise with a few hundred passengers. The boat docked at approximately 11:30 p.m. and was tied into a shoreside water connection.

Sometime between midnight and 12:15 a.m. on August 24th, the flood valve located in the engine room of the *Belle* was opened approximately two revolutions causing water from the hook-up to the city water system to pour into the boat's hull. The valve handle was difficult to turn. The valve was located on a pipe which was connected to the boat's potable water intake system. Opening the valve resulted in a massive influx of water (55 to 60 gallons per minute) that went undetected by the boat's night watchman for several hours. The internal rush of water ultimately caused the boat to tilt sideways allowing water from the river to pour over the sides of the boat. Collectively, the water from the open valve and the river caused a portion of the boat to sink and settle onto the riverbed shelf. Despite the government's theory that an intruder crept aboard the *Belle* in the dead of night and opened the valve, no eyewitness saw an intruder go on board and open the valve, there are no fingerprints that the intruder left on the handle of the valve, and there is no confession.

The partial sinking of the *Belle* was not discovered by the night watchman until approximately 7:00 a.m. on August 24, 1997. Thereafter, people were able to go aboard the boat and open the throttle and a couple other valves in order to bleed steam off the boilers and thereby prevent a possible explosion. Some of them were in the water when electrical power to the *Belle* was still on. A diver named Milton Hettinger was one of the people who assisted with the work on the *Belle* that Sunday morning. He testified that he attached a one-inch thick metal cable around a cleat at the bow of the boat to prevent the *Belle* from slipping further into the Ohio River. He stated that if the cable had snapped, he "could have been cut in two like hot butter." J.A. at 751. The *Belle* was eventually recaptured, repaired, and is currently in full operation.

The United States Coast Guard conducted a thorough investigation of the *Belle's* sinking and issued a report. The Coast Guard recorded the interviews of dozens of witnesses, assessed all of the physical evidence, and reviewed all of the circumstances surrounding the open flood valve. In the end, however, the Coast Guard could not be sure whether the flood valve was opened before, during, or after the passengers disembarked following the cruise. The Coast Guard found that the valve could have been opened by a passenger during the evening cruise or by a crew member. The investigation by the Coast Guard revealed no direct evidence of any intentional criminal activity.

Engine room crew members of the *Belle* testified that during every cruise the flood valve was kept under their constant watch, the engine room was never left unmanned, and no passenger was allowed to touch the flood valve. They further testified that no passenger had ever opened the flood valve during a cruise, and no crew member had ever accidentally opened the flood valve in the course of his duties. Chief Engineer Leroy Culp and Striker Steve Priser also testified that no one had touched the flood valve during the August 23rd cruise. Finally, crew members were instructed that

the flood valve was not to be used during the operating season because it would leak water into the hull.

On September 8, 1997, Jefferson County Judge–Executive Dave Armstrong (now the mayor of Louisville) and Police Chief Ron Riccuci held a television news conference to announce that the county was initiating its own criminal investigation. Thereafter, Judge Armstrong would come down to the wharf each day that the *Belle* was still located there and get a briefing from everyone involved in the salvage operation. Then, he would take a megaphone, approach the crowd of people that had gathered, give a briefing, and entertain questions from the crowd.

During the investigation, the county sought the assistance of defendant Brennan James Callan, a local steamboat enthusiast and self-claimed "former engineer on the *Belle*." Defendant was 31 years old at the time. Callan is a lifelong resident of Louisville and an avid scholar of sunken steamboats. Although he had previously worked in the *Belle's* engine room, at the time of the *Belle's* sinking the defendant was a full-time student at the University of Louisville.

Callan had worked on the *Belle* during the summer of 1994, but was terminated at the end of the season. Engineers Michael Pfleider and James McCoy testified that they terminated the defendant for poor work performance. Upon being told that he was discharged, the defendant became argumentative, made excuses, and blamed other crew members for whatever happened. Callan reapplied for a job in 1995, 1996, and 1997, but was never rehired. After Callan's last rejection on August 8, 1997 for a deck hand position, he "looked disappointed ... waved his hand up, turned around and walked off." J.A. at 540. Later that day, Callan went to the wharf close to midnight. He spoke with

the night watchman, Robert Stiles, and observed the watchman begin his security rounds.

Callan was first interviewed at his parents' home by Detective Denny Butler of the Jefferson County Police Department on the morning of September 16, 1997. Throughout his life, the defendant had gathered countless collectibles and other memorabilia of the *Belle* and other boats. A small part of his collection included photographs of the *Belle*, including some of the boat's engine room. Callan invited Detective Butler into the basement of his residence where he said he had a blueprint of the *Belle*. Callan mentioned that he was working on a technical manual that described inefficiencies and problems in the operations of the engineering department, as well as problems with the management of the *Belle*. Defendant shared his *Belle* memorabilia and research, and offered his insights on the boat. Callan, however, did not have any memorabilia about the sinking. Detective Butler asked Callan if he thought the sinking was an accident. Callan said, "No. I think it was an intentional act." J.A. at 374. Defendant also offered theories as to who might have opened the flood valve and how it might have been done.

Defendant described the security system on the *Belle* and how one could defeat it. He told Detective Butler that an intruder could gain access to the engine room by three methods: 1) opening a door near the engine room; 2) climbing through a horizontal hatchway parallel to the "pitman arm" that cranked the boat's paddle wheel; and 3) walking along the pitman arm itself, which led directly into the engine room. In addition, Callan explained in detail when the night watchman would start his security rounds and what the watchman would do. When the watchman entered the *Belle* roughly on the hour, he would

deactivate the two motion detectors that were just in front of the engine room and between the boiler room. Then the watchman would make his rounds hitting key stations throughout the boat (including the pilot house located on the fourth level), before resetting the security system when he exited.

After his initial meeting with Detective Butler, Callan continued to meet with investigators on a volunteer basis. He showed up around noon on September 16, 1997, at the Jefferson County Police Department headquarters where he was interviewed by Detectives Butler, Ingram, and Ennis about his whereabouts on the evening of August 23, 1997. Callan told the detectives that he was at home the entire night and that he slept all night after going to bed around eight o'clock. He awoke on Sunday morning and was notified at 7:30 a .m. that the *Belle* had 'sunk. Defendant said he was at home the entire day on Sunday watching television and videotaping the news coverage about the *Belle*. When Detective Ennis stated two or three times that the sinking of the *Belle* could not have been done by one person, it would have taken two people, Callan declared, "There was no one else." J.A. at 395. Defendant was confronted with a piece of evidence that he had made a statement to someone on the wharf on Monday, August 25, 1997, that the cause of the boat sinking was a valve left open. Callan also admitted that he knew about the flood valve and that it would allow fresh water to go directly into the hull.

After the *Belle's* sinking, Callan even developed an Internet web page dedicated to discussing his theories on the sinking and those likely responsible for it. The web page stated in part:

> Overall, the responsibility of this situation rests upon the watchman on duty. It is his/her responsibility to visually check the hull's 35 "watertight compartments" with a flashlight on an hourly basis and to use his watch clock as he makes his rounds on the boats. Only using the watchclock (sic) and not checking the "watertight compartments" is disreguarding (sic) his task as it is if he allowed someone to board the boats.

> \* \* \* \* \* \*

> Here is a more important question, since the tanks that the valve lead to were taken out years ago, why did the valve remain? Each new member of the engineering crew is expected to learn the purpose of the valves throughout the boat. When I was told that this valve was never to be turned because it would put water directly into the hull, I asked, "Why does it still exist if the tanks are gone?" I was told that when the Belle is out of trim, especially on race day of the Great Steamboat Race against the Delta Queen and occasionally other visiting boats, they would allow the Coast Guard to perform their complete inspections of the vessel. Once the inspectors departed, the Engineering Crew would intentionally take on water to bring the bucket planks of the paddlewheel down into the water enough to get a good bite.

Government Ex. 10, J.A. at 779–80. The web page was also critical of the *Belle's* management and engineering department.

Contrary to Callan's statement that he was at home the entire day on Sunday, Kerry Nicols and five other government witnesses testified that they observed Callan on the wharf on August 24, 1997. Nicols testified that at approximately 2:00 p.m., Callan told her that the cause of the boat sinking was an intake valve from the city water line that was left open—something investigators did not determine or announce until days later. Callan indicated where the valve was located by showing her a booklet that contained a diagram of

the underside of the *Belle*. Jack Custer testified that sometime after 3:00 p.m., Callan told him that he felt the cause would be found to be a valve. He recognized the defendant from a newspaper article from the week before that included a picture of Callan. Defendant also gave Custer his business card. Kenneth Meredith, the executive director of the *Belle* operating board, also testified that he talked to Callan on the wharf on August 24, 1997. Defendant introduced himself, gave Meredith his business card, and offered his assistance with the media.

Callan, however, was not the only person to suspect that an open valve caused the sinking. Hettinger testified that he asked four people who were within ear shot on the wharf that day, including two *Belle* engineers (Pfleider and McCoy), "Who left the water on?" J.A. at 651. Alan Geiger also testified that in the late afternoon, early evening hours of August 24, 1997, while in close proximity to the *Belle*, he had a conversation with a gentleman (not the defendant) wherein the gentleman said, "Well, when they raise it up they're going to find the valves are open." J.A. at 697.

Defendant's mother testified at trial that she saw the defendant at their home around noon on August 23, 1997. She stated that upon arriving back home close to eight o'clock that evening, she noticed the defendant's car parked in the driveway and his key ring with the car and house key laying on the kitchen table. The key ring was still on the table at about 11:45 p.m. when, after locking the doors to the house, Mrs. Callan went upstairs to go to bed. She looked towards the defendant's room. The door was closed, but from under the door she could see a light glow and she heard the TV on low. She, however, did not physically see the defendant. Defendant's mother also did not hear a car leaving the driveway prior to falling asleep around 12:30 a.m.

Mrs. Callan testified further that she got up about nine or ten o'clock the morning of Sunday, August 24th, the defendant's car was parked in the driveway, the key ring was on the kitchen table, and she saw the defendant come downstairs between 11 and 12 o'clock. Callan told her that his brother, David, had telephoned him and said that the *Belle* was sinking, and that the defendant had been watching it on television. Callan went upstairs after lunch and his mother did not physically see him again until dinnertime. Neither did she see him leave at anytime that day.

On the evening of September 16, 1997, Callan went to Kinko's located at the Plainview Shopping Center and told the assistant manager, Nichole Cooley, and Amanda Petters, another Kinko's employee, that he was under investigation and needed to verify his whereabouts on August 24, 1997. He told Cooley and Petters that he remembered seeing and talking to them at Kinko's between 2:30 and 5:30 a.m. on August 24th, while he was laminating some newspaper articles about himself. Callan showed them that his hand-held electronic pocket calendar displayed that he was at Kinko's during that time. According to their time sheets, however, neither employee had worked on August 24th between 2:30 and 5:30 in the morning.

Late in the evening of September 25, 1997, the defendant was reinterviewed by Detective Butler. Contrary to Callan's prior statements to the detectives that he slept all night and awoke on the morning of Sunday, August 24, 1997, at 7:30 a.m., the defendant told Detective Butler and showed the detective that his hand-held electronic pocket calendar showed that on August 24th, he was at Kinko's from 2:30 to 5:30 in the morning. Therefore, he would not have been able to sink the *Belle*.

J.A. at 404–405. As he had done on September 16, 1997, the defendant said that the police should be searching for other people, that they had the wrong person. Callan asserted that they should be looking at someone who worked or works in the engineering department of the *Belle*, who had knowledge of the valve and how to defeat the security system, and who would have had a motive.

On February 10, 1998, government agents executed a search warrant of Callan's residence, car, and canoe. During the search, agents removed several boxes of memorabilia, photographs, papers, and computer-related items from Callan's basement, computer room, bedroom, and car. Out of the hundreds of photographs of the *Belle* that were seized, one of them depicted the flood valve among various other engine room equipment.

On April 6, 1998, Callan was indicted by a federal grand jury in the Western District of Kentucky at Louisville. This action came on for trial before the court and a jury on February 8, 1999. By agreement of the parties, each member of the jury venire filled out a juror's questionnaire form. Before the trial began, the district court ordered that all witnesses were to be excluded from the courtroom. *See* Fed.R.Evid. 615. Detective Butler and Coast Guard Criminal Investigator Timothy Quinn, however, were allowed to remain in the courtroom during trial. Defendant did not testify in his own defense. On February 18, 1999, the jury returned a verdict of guilty against Callan for tampering with a vessel of the United States in violation of 18 U.S.C. § 2275.

Following the verdict, Callan filed a motion for judgment of acquittal based on insufficiency of the evidence and two mo-

tions to contact the jurors. Callan also filed a motion for new trial based on: 1) juror misconduct based upon the actions of the foreperson, Juror No. 55,[1] 2) the trial court's denial of his motion to contact jurors, 3) the verdict being contrary to the weight of the evidence, 4) prosecutorial misconduct, 5) the introduction of improper character evidence, and 6) the fact that Custer, a government witness, watched approximately three days of the trial prior to testifying despite the district court's order separating witnesses. Further, Callan filed another motion for new trial based upon newly discovered evidence that Juror No. 55 failed to disclose on his juror questionnaire that he had a criminal case pending against him. All five motions were denied by the district court.

Defendant's presentence report ("PSR") was distributed in April 1999. The ground for departure, endangering lives, was noted in the PSR. In the section entitled "FACTORS THAT MAY WARRANT DEPARTURE," the PSR provides:

> 91. Section 5K2.14 provides that the court may increase the defendant's sentence above the guideline range if public safety was significantly endangered. In this case, the lives and health of the crew members and other workers initially responding to try and rescue the sinking vessel April 23(sic), 1999, were endangered as a result of the defendant's acts.

J.A. at 821. The PSR also described Callan's financial resources and assets, as well as his financial obligations. Further, the PSR reflected that the defendant had completed three years of college.

On June 30, 1999, Callan was sentenced to a 30–month prison term and was or-

---

1. This opinion will refer to the juror in question solely by number in order to protect his privacy.

dered to pay $987,818.32 in restitution. The amount of restitution was stipulated to by the defendant. The district court granted an upward departure for extreme risk to life pursuant to § 5K2.0 of the Sentencing Guidelines. The court imposed a one-level upward departure based on a finding that the defendant caused danger to individuals who rescued the *Belle* after it sank, which resulted in a Departure Guideline Imprisonment Range of 27 to 33 months. The court also determined that Callan did not have the ability to pay interest and, accordingly, waived interest on the restitution. Payment of the restitution was subsequently ordered "due in full immediately." Callan's timely appeal followed.

On June 21, 1999, Callan filed a motion for bond pending appeal. On August 9, 1999, the trial court granted the motion.

### I.

In his first assignment of error, Callan contends that the trial court erred by denying his motions for judgment of acquittal and for a new trial when there was insufficient evidence to support the conviction and the verdict was contrary to the weight of the evidence.

Callan was convicted of violating 18 U.S.C. § 2275. That section provides:

Whoever sets fire to any vessel of foreign registry, or any vessel of American registry entitled to engage in commerce with foreign nations, or to any vessel of the United States, or to the cargo of the same, or tampers with the motive power of instrumentalities of navigation of such vessel, or places bombs or explosives in or upon such vessel, or does any other act to or upon such vessel while within the jurisdiction of the United States, or, if such vessel is of American registry, while she is on the high sea, with intent to injure or endanger the safety of the vessel or of her cargo, or of persons on board, whether the injury or danger is so intended to take place within the jurisdiction of the United States, or after the vessel shall have departed therefrom and whoever attempts to do so shall be fined under this title or imprisoned not more than twenty years, or both.

The term "vessel of the United States" is defined in 18 U.S.C. § 9 as "a vessel belonging in whole or in part to the United States, or any citizen thereof, or any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof."

First, the defendant argues that there was insufficient evidence to support a finding that he stole upon the *Belle* and tampered with the vessel between 11:30 p.m. and midnight on August 23, 1997. Whether viewed under a sufficiency of evidence standard, *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), or a manifest weight of evidence standard, *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir.1988), Callan contends that the evidence that he "acted upon a vessel" was inadequate to support a conviction.

After a careful examination of the record and a consideration of the well written briefs and the oral argument of the parties, we agree with the government that the circumstantial evidence presented, as recited above, was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt of violating 18 U.S.C. § 2275. "It is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361, 363 (6th Cir.1984). We also find that Callan has pointed to no specific problems or conflicts so egregious or extraordinary

that would warrant a finding that the trial court committed a "clear and manifest" abuse of its discretion in denying Callan a new trial based on the weight of the evidence.

Second, Callan contends that there was insufficient evidence to support a finding that the *Belle* is a "vessel of the United States." The government contends that the vessel is "owned" by a citizen of the United States (the citizens of Jefferson County and/or Jefferson County), and is therefore a "vessel of the United States" within the meaning of 18 U.S.C. § 9. If a citizen "owns" a vessel it "belongs" to him. *United States v. Newball*, 524 F.Supp. 715, 719 (E.D.N.Y.1981).

■ The government introduced evidence that the *Belle* was owned by the citizens of Jefferson County and the county. The executive director of the *Belle* operating board testified that in 1962, Jefferson County Judge Marlow Cook, along with the people of Jefferson County, Kentucky purchased a river steamboat named *Avalon* for $34,000.00 at an auction. Thereafter, the name was changed to the *Belle of Louisville*. Further, as a victim of this property crime, Jefferson County Public Properties is to receive $460,962.59 of the total restitution ordered by the district court. *See* J.A. at 196.

■ Under Kentucky law, Jefferson County is a *quasi*-municipal corporation and a citizen of the United States. *See Brown v. Marshall County*, 394 F.2d 498, 500 (6th Cir.1968), citing *Howell v. Haney*, 330 S.W.2d 941, 943 (Ky.1959). We conclude that sufficient evidence existed to support a finding that the *Belle* was shown to be a vessel of the United States.

## II.

Callan requests that his conviction be reversed because the district court erred by admitting prejudicial and irrelevant character evidence suggesting that he lied when he initially told police that he was at home all night on August 23, 1997, and then later told them that he was at Kinko's from 2:30 to 5:30 in the morning on August 24th. Defendant argues that the events that allegedly occurred at Kinko's from 2:30 to 5:30 in the morning on August 24th are in no way probative of whether the defendant stole upon the *Belle* and opened the flood valve between 11:30 p.m. and midnight on August 23, 1997. The government contends that Callan's actions in lying about where he was the early morning hours of August 24, 1997, were consistent with the actions of a person who knows he's guilty. Further, Callan maintains that his termination from the *Belle*, which occurred three years before the boat sank, was irrelevant and improper character evidence.

■ Although evidence of "other crimes, wrongs, or acts" is not admissible to prove the character of the defendant, it is admissible to prove consciousness of guilt. Fed. R.Evid. 404(b). *See United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir.), *cert. denied*, 510 U.S. 886, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993). Pursuant to Rule 404(b), the admission of evidence of other bad acts is permitted when probative of motive, opportunity, intent, preparation, plan, knowledge, or consciousness of guilt.

■ We hold that the trial court did not abuse its discretion in admitting the evidence as it was admissible to show Callan's consciousness of guilt and motive. In addition, the probative value of the evidence was not outweighed by the prospect of unfair prejudice. Callan's statement to Detective Butler on September 25, 1997, that he would not have been able to sink the *Belle* because on August 24th, he was at Kinko's from 2:30 to 5:30 in the morning (as well as showing the detective that his

hand-held electronic pocket calendar corroborated the same) was relevant evidence concerning the defendant's consciousness of guilt. The testimony of Cooley and Petters that Callan went to Kinko's on the evening of September 16, 1997, and told them that he needed to verify his whereabouts on August 24, 1997 and that he remembered seeing and talking to them at Kinko's between 2:30 and 5:30 a.m. on August 24th (when neither employee had worked during those hours) was also relevant evidence concerning Callan's consciousness of guilt. *See United States v. Mendez–Ortiz,* 810 F.2d 76, 79 (6th Cir. 1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987).

■ Further, Callan's termination from the *Belle* for poor work performance was not irrelevant and improper character evidence. Rather, it was relevant evidence concerning the defendant's motive to sink the *Belle.* Callan reapplied for a job in 1995, 1996, and 1997, but was never rehired. His last rejection occurred the same month as the sinking of the *Belle.*

### III.

In his third assignment of error, Callan contends that the district court erred by denying his motions for a new trial and motions to contact jurors based on juror misconduct. Defendant argues that it was demonstrated that Juror No. 55 concealed information from the defense attorneys regarding the juror's prior employment on the *Belle* and the fact that the juror had a pending felony case against him. Defen-

dant maintains that this constitutes juror misconduct that required that the trial court conduct a hearing or, at the very least, allow defense counsel to contact the jurors by mailing them a letter.[2]

Juror No. 55 was charged with two counts of wanton endangerment, evidently for the same conduct, to wit: the discharge of firearms on his property. In December 1998, the charges were deferred for six months, to be dismissed on the condition that he comply with the terms and conditions of the deferral. In response to the juror questionnaire from the district court, Juror No. 55 disclosed that he had been charged with the crime of wanton endangerment. He answered "No" to the question, "Are any charges now pending against you punishable by imprisonment for more than one year?" In a wrap-up question, the questionnaire asked for any additional information that the court should know. Juror No. 55 wrote: "The charge of Wanton Endangerment was deferred/dismissed. It was a bogus charge."

■ A trial court is only required to conduct a hearing to determine the effect of alleged misconduct if the defendant proves that: 1) a juror failed to answer honestly a material question during jury selection, and 2) a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

■ Callan failed to make sufficient showings to require a hearing or other

**2.** Callan states that "[d]ue to space limitations, the grounds underlying this assignment of error are abbreviated. A more complete discussion is found in Mr. Callan's motions for a new trial." Appellant's Brief at 36 n. 1. Attorneys, however, cannot circumvent the type-volume limitation of Fed. R.App. P. 32(a)(7)(B)(i) by incorporating by reference trial memoranda. *See Walters v. First Tenn. Bank, N.A.,* 855 F.2d 267, 275–76 n. 5 (6th Cir.1988), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1344, 103 L.Ed.2d 812 (1989); *see also Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1430 (7th Cir.1986) (holding that issues cannot be preserved by reference to documents filed in the district court; issues must be argued to be preserved).

relief on his allegation that Juror No. 55 had lied in his answers given to the juror questionnaire. Juror No. 55 revealed the critical information that he had been on the *Belle* ten or more times and that he was friends with one of the captains of the boat. The juror was not asked the purpose for which he was on the *Belle*, which included playing in a band twice.[3] With regard to the criminal case, Juror No. 55 revealed his prior record and accurately reported the dispositions to the best of his knowledge. Callan also failed to make a colorable claim that Juror No. 55 was biased in favor of the government. We, therefore, conclude that Callan has failed to demonstrate that the district court abused its discretion in handling these allegations.

## IV.

We next address Callan's contention that the trial court wrongly denied his motion for a mistrial and motions for a new trial based on prosecutorial misconduct. Defendant argues that the prosecutor alluded to inadmissible evidence, unfairly directed a witness to identify Callan in the courtroom, withheld crucial discovery materials, and called Callan a "liar" in closing arguments even though the defendant did not testify.

■■■ When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. If they appear improper, we then look to see if they were flagrant and warrant reversal. To determine flagrancy, the standard set by this Court is: 1) whether the statements (as mitigated by any curative instructions) tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the

statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. To reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by admonishing the jury. *United States v. Francis,* 170 F.3d 546, 549–550 (6th Cir.1999) (citations omitted).

■■■ Callan complains that, though the district court ruled evidence that the defendant failed a polygraph test inadmissible, the government alluded to the suppressed evidence during the trial. In December 1997, government investigators met with Callan's mother and described some of the evidence against the defendant, including the polygraph results. Mrs. Callan commented at that time that some of the government's evidence would not be admissible against her son at trial. The following exchange subsequently occurred during cross-examination of Mrs. Callan by Duane Schwartz, the prosecutor, at the trial:

Q. Okay. When we met, I indicated to you that your—that your son was a suspect, had I not?

A. You did.

Q. And isn't it true I described some of the evidence against him, did I not?

A. Correct.

Q. And you did respond that some of that evidence probably wouldn't be admissible, didn't you?

A. I thought it wouldn't be.

MS. HAWORTH: Objection, Your Honor. May we approach?

J.A. at 681. The district court declared the question and answer to be irrelevant,

---

**3.** The joint appendix does not contain a transcript of the *voir dire* proceedings.

and admonished the jury to ignore them. *Id.* at 683. The government properly concedes that the challenged question was "badly worded and appropriately stricken" by the trial court. Appellee's Brief at 38. But the question was not improper when analyzed in light of case law describing statements that do rise to the level of prosecutorial misconduct because neither the challenged question nor the answer communicated to the jury the substance of the purported facts that are not in evidence and are prejudicial, *i.e.*, that Callan failed a polygraph examination. *See United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir.1991).

■ We also find the defendant's argument that the prosecutor unfairly directed a witness to identify Callan in the courtroom to be lacking in merit. Nicols was one of six government witnesses who testified that they observed Callan on the wharf on Sunday, August 24, 1997. She conversed with him at fairly close quarters while making eye contact without any obstruction to her vision. Nicols testified on cross-examination that she saw Callan on the television news when he was arrested and she recognized him. J.A. at 571. The following exchange occurred during her direct examination:

Q. All right. Thank you. You may have your seat. Do you recall seeing the Defendant there that afternoon?

A. Yes, I do.

Q. Would you please look to your right and see if you recognize—

MR. BOULDIN: Your Honor, could we approach for a moment?

J.A. at 565. Nicols identified Callan as the one with whom she had spoken on the wharf. Given the prosecutor's suggestive directions and the resulting sidebar conference that both of his counsel attended, Callan contends that he was the only person sitting at counsel table that Nicols could have identified. The government notes that "[t]he instruction to 'look to the right,' though not to be recommended as protocol, was not unduly suggestive." Appellee's Brief at 44.

In properly denying the defendant's motion to strike the in-court identification, the district court observed that "there are a bunch of people over to the right" and "she picked Mr. Callan out as opposed to the Defense Attorney or something." J.A. at 574. Nicols's identification of Callan was reliable. The trial court observed that the witness "seemed to do a pretty good job" with the identification. *Id.* at 573. As long as her identification of Callan was reliable, any error in the examination of Nicols was harmless, and the defendant suffered no prejudice justifying a new trial. *United States v. Hill*, 967 F.2d 226, 229–30 (6th Cir.1992).

During the trial, defense counsel objected to the testimony of Detective Butler regarding the statements that Callan had made concerning how an intruder could gain access to the engine room and how many people were involved in the sinking of the *Belle*. Defense counsel also objected to the testimony of Detective Butler regarding the defendant's response to the evidence that he had made a statement to someone on the wharf on Monday, August 25, 1997, that the cause of the boat sinking was a valve left open. Defense counsel complained that the government had not sufficiently disclosed these items prior to trial. But the government did disclose the reports containing the substance of the prior conversations between Detective Butler and Callan. The district court observed that the detail of getting on the boat had been revealed to defense counsel in time for them to make effective use of the information in the trial. J.A. at 386. Finally, defense counsel objected because they were not shown the actual flood valve.

■ The government contends that Callan has failed to show the district court abused its discretion by declining to suppress the evidence when the allegation of a discovery violation was disputed and the defense obtained the evidence in time to avoid any prejudice. This Court agrees. Defense counsel cross-examined Detective Butler at length, and to some advantage, about the written summaries not reflecting these and other statements that the defendant had made to Detective Butler. Further, there is no evidence that the unavailability of the actual flood valve was the result of bad faith by the prosecution.

Defendant's argument that the prosecutor repeatedly called the defendant a liar during closing argument is raised for the first time on appeal. Because Callan failed to object to the statements during the trial, he must demonstrate plain error. *See United States v. Young,* 470 U.S. 1, 15–16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *United States v. Carroll,* 26 F.3d 1380, 1383 (6th Cir.1994). In reviewing a prosecutor's comments for plain error, we reverse a conviction "only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *Carroll,* 26 F.3d at 1383 (quotations omitted). This is not such a case. *United States v. Austin,* No. 97–4197, 2000 WL 32017, at *14–16 (6th Cir. Jan.4, 2000) (unpublished opinion).

■ Callan's claim of prosecutorial misconduct must fail. We conclude that the prosecutor's statements were not improper, nor were they flagrant. They were not made in order to, nor did they have a tendency to, mislead the jury or prejudice Callan. The worst example of prosecutorial error alleged by the defendant is an admittedly ill-conceived question to Mrs. Callan that could have suggested the existence of evidence the government was not allowed to present. It was immediately cured and not repeated. Further, the district court did not abuse its discretion with regard to the alleged violations of discovery and inspection rules.

## V.

In his fifth assignment of error, Callan contends that the district court erroneously instructed the jury on weighing the evidence. Callan argues that, over defense counsel's objections, the trial court did not inform the jury that its use of common sense must be grounded in the facts presented during trial. Defendant maintains the trial court also unnecessarily restricted the jury's discretion to weigh direct and circumstantial evidence by stating that they were presumed to be equal, but failing to state that the jurors had the discretion to give whatever weight they chose to each type of evidence presented.

■ This assignment of error arises from a judgment of conviction that was based primarily on circumstantial evidence wherein the district court's jury instruction included the following passage:

> *In considering the evidence[,] you may make deductions and reach conclusions which reason and common sense lead you to make. And you need not be concerned about whether the evidence is direct or circumstantial.* Direct evidence is the testimony of one who asserts actual knowledge of the fact such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating that the Defendant is either guilty or not guilty. *The law makes no distinction between the weight you may give to either direct or circumstantial evidence.*

J.A. at 728 (emphasis added). Callan claims the court should have instructed the jury to "use their reason and common

sense to draw deductions or conclusions from the facts established by the evidence ." Appellant's Brief at 47 (emphasis in original). Defendant's concern that the jury could have believed it could draw inferences and conclusions from information outside the record is not a fair reading of the instruction, especially when read in light of the jury charge as a whole.

■ Next, Callan complains that the trial court wrongly informed the jury that it had no discretion to weigh the direct evidence versus the circumstantial evidence. We find that the instruction follows *York v. Tate*, 858 F.2d 322, 328 (6th Cir.1988) ("The modern view is that the law generally makes no distinction between direct or circumstantial evidence nor requires particular instruction to the jury, allowing jurors to give evidence the weight which they believe it is entitled.") (quoting *Scott v. Perini*, 662 F.2d 428, 433–34 n. 7 (6th Cir.1981), *cert. denied*, 456 U.S. 909, 102 S.Ct. 1758, 72 L.Ed.2d 167 (1982)). The jury instructions were neither confusing, misleading, nor prejudicial. We find no error in the instruction regarding the jury's evaluation of the evidence.

## VI.

In his sixth assignment of error, Callan contends that the trial court erred by allowing Jack Custer to testify and by allowing the government to have two case agents at counsel table throughout the trial.

■ Callan cites Fed.R.Evid. 615 in support of his argument that Custer was used to "fill in the gaps" of other witnesses and offered prejudicial testimony against the defendant by conforming his testimony to that of prior witnesses. Rule 615 states:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of ... (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause....

A violation of the rule directing a separation of witnesses does not automatically bar a witness from testifying. This is a matter within the discretion of the district court. *United States v. Gibson*, 675 F.2d 825, 835–36 (6th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982). Before permitting Custer to testify, the trial court properly conducted a *voire dire* examination to determine whether Rule 615 had been breached by determining whether Custer had some independent information that was untainted by his presence in the courtroom. *See* J.A. at 574–86. There is no evidence that Custer came forward as a witness as a result of collusion with the government and no evidence that the substance of Custer's testimony was fabricated as the result of what he heard during part of the trial.

■ Prior to trial, the government presented a "reasonable, substantiated representation" to the district court that Agent Quinn was essential to the government's presentation of the case. *See* J.A. at 693–94; Subpart (3) of Rule 615. We conclude that the trial court properly allowed Agent Quinn to remain in the courtroom and also to testify against Callan during trial. The agent, who worked for the Coast Guard Investigative Service, had specialized knowledge about boats and maritime terminology. *United States v. Mohney*, 949 F.2d 1397, 1404–1405 (6th Cir.1991); *see also United States v. Headley*, No. 99–

3019, 2000 WL 1359620, at *8–9 (6th Cir. Sept.11, 2000) (unpublished opinion).

## VII.

■ In his seventh assignment of error, Callan contends that the cumulative effect of all the aforementioned errors, as well as four other claims of trial-related errors and misconduct, deprived him of a fair trial. In order to obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair. *United States v. Parker,* 997 F.2d 219, 221 (6th Cir.1993). We agree with the government that there is no showing on the record in this case that the defendant was denied a fundamentally fair trial. Therefore, Callan is not entitled to a new trial on the basis of cumulative error.

■ Callan alleges that, in addition to the aforesaid errors, he is entitled to a new trial because:

1) the trial court permitted highly prejudicial photographs depicting the defendant working in the *Belle's* engine room in 1994, despite the trial court's finding that the pictures were of "thin relevance" to the government's case;[4]

2) the district court denied his motion to suppress evidence seized from his home, despite evidence that the affidavit accompanying the search warrant was overbroad;

3) Detective Butler, through the aid of the prosecutor, repeatedly attempted to inject inadmissible hearsay statements during his testimony; and

4) the trial court denied his motion to change venue despite the fact that there was a local media frenzy surrounding the case, inadmissible evidence (the defendant's personnel record from the *Belle* ) had been leaked to the public before trial, and the *Belle* was a historical symbol for the people of Louisville.

However, the defendant fails to even argue, not to mention cite any case law for, these additional instances of alleged trial-related errors and misconduct. *See Bush v. Dictaphone Corp.,* 161 F.3d 363, 370 (6th Cir.1998). Therefore, Callan has forfeited review of these four claims by this Court. *See United States v. Reed,* 167 F.3d 984, 993 (6th Cir.1999) (holding that issues raised by an appellant in a perfunctory manner, unaccompanied by some effort at developed argumentation, are considered abandoned); *United States v. Elder,* 90 F.3d 1110, 1118 (6th Cir.1996).

## VIII.

In his last assignment of error, Callan contends that the trial court erred when it sentenced him by failing to give him proper notice of the legal grounds for an upward departure, granting the departure without reviewing the heartland of cases, and ordering him to pay full restitution under a payment plan rather than allowing him to make nominal periodic payments.

Callan complains that he must be given notice of the specific Guidelines section under which the district court intends to depart. The government argued and the district court found that an upward departure was appropriate on the factual grounds noted in the PSR, but under § 5K2.0 of the Sentencing Guidelines (factor not adequately taken into account by guideline).[5] The court departed one level

---

4. Callan's specific reference to the record (Sidebar Tr. III at 11–18, Apx. 234–41) is incorrect. *See* Appellant's Brief at 56.

5. As stated above, the PSR referenced § 5K2.14 (public welfare).

to an offense level of 17, which resulted in a Departure Guideline Imprisonment Range of 27 to 33 months.

Federal Rule of Criminal Procedure 32(c)(1) provides that "[a]t the sentencing hearing, the court must afford counsel ... an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence...." The purpose of Rule 32 is to promote "focused, adversarial resolution of the legal and factual issues relevant to fixing Guidelines sentences." *Burns v. United States,* 501 U.S. 129, 137, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991); *see also United States v. Hayes,* 171 F.3d 389, 392 (6th Cir.1999).

In *Burns,* the Supreme Court noted that "[i]n the ordinary case, the presentence report or the Government's own recommendation will notify the defendant that an upward departure will be at issue and of the facts that allegedly support such a departure." *Id.* at 135, 111 S.Ct. 2182. In *Burns,* however, the district court had decided at the conclusion of the sentencing hearing—"on its own initiative"—that the factual and legal predicates for a departure were satisfied. *Id.* The Supreme Court vacated the sentence for inadequate notice, holding:

> [B]efore a district court can depart upward on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, Rule 32 requires that the district court give

the parties reasonable notice that it is contemplating such a ruling. This notice must specifically identify the ground on which the district court is contemplating an upward departure.

*Id.* at 138–39, 111 S.Ct. 2182.

■ Although unequivocally establishing that Rule 32 requires "reasonable notice," the Court explicitly left open the question of when notice must be given to qualify as reasonable. *Id.* at 139 n. 6, 111 S.Ct. 2182. Admittedly, Callan had notice the day before the sentencing hearing that the government would seek an upward departure. *See* J.A. at 743. Further, the ground for departure—endangering lives—was noted in the PSR, albeit in reference to § 5K2.14 (public welfare). We find that the defendant was properly on notice that a departure might be at issue. *United States v. Thomas,* 24 F.3d 829, 836 (6th Cir.), *cert. denied,* 513 U.S. 976, 115 S.Ct. 453, 130 L.Ed.2d 362 (1994); *United States v. Anders,* 899 F.2d 570, 576–77 (6th Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 543 (1990) (the PSI satisfies the notice requirement for upward departures as long as it specifically identifies the facts or information that may warrant such a departure). Callan's counsel also was not placed in the position of "trying to anticipate and negate every conceivable ground on which the district court might choose to depart on its own initiative." *Burns* 501 U.S. at 137, 111 S.Ct. 2182; *see also United States v. Milton,* 147 F.3d 414, 420–21 (5th Cir.1998).[6]

---

**6.** In rejecting the government's argument that Rule 32 and *Burns* require notice of the factual but not the legal grounds for departure, the Ninth Circuit held that "[b]oth factual and legal grounds for departure are within Rule 32's reach." *United States v. Hinojosa–Gonzalez,* 142 F.3d 1122, 1123 (9th Cir.1998). However, in holding that the district court provided adequate notice of its intention to depart upward at sentencing as required by

Rule 32, the Ninth Circuit subsequently stated:

> Hernandez contends that *United States v. Hinojosa–Gonzalez,* 142 F.3d 1122, 1123 (9th Cir.1998), establishes that a defendant is denied the right to adequate notice under Rule 32 when notice of an intended departure is given at the sentencing hearing. We disagree. The issue addressed in *Hinojosa–Gonzalez* was whether the defendant must

Callan next argues that the trial court's decision to grant a one-level upward departure should be reversed because this case is not outside the Guidelines' heartland of other "tampering with vessel" cases.

A departure from the Sentencing Guidelines can be made if, in the sentencing court's view,

> there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. Circumstances that may warrant departure from the guideline range pursuant to this provision cannot, by their nature, be comprehensively listed and analyzed in advance.

U.S. Sentencing Guidelines Manual § 5K2.0 (2000) (quotation marks omitted). We review a district court's decision to depart from the Guidelines for abuse of discretion. *Koon v. United States*, 518 U.S. 81, 99, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v.. Moses*, 106 F.3d 1273, 1277 (6th Cir.1997). Where a ground for departure is not proscribed by the Guidelines, "the sentencing court must determine whether the factor, as occurring in the particular circumstances, takes the case outside the heartland of the applicable Guideline." *Id.* at 109, 116 S.Ct. 2035.

■ The district court granted the departure based upon a finding that the defendant's actions threatened the safety of individuals during the salvage operation. It found this to be an aggravating circumstance that took the case "outside the heartland" of similar cases. We find the record was sufficient to support the district court's discretionary decision on this point.

Finally, we discern no error in the district court's order of restitution which provided for Callan to pay full restitution under a payment plan rather than allowing him to make nominal periodic payments.

Under the Mandatory Victim Restitution Act ("MVRA"), enacted in 1996, district courts are obligated to impose restitution in the full amount to each victim of a property crime "without consideration of the economic circumstances of the defendant." *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii); § 3664(f)(1)(A). It is not disputed that restitution in this case is statutorily mandated, and the amount of restitution was stipulated to be $987,818.32.

"The offender's ability to pay is relevant only in determining whether restitution should be paid by lump sum, a schedule of payments, or nominal payments." *United States v. Gray*, 175 F.3d 617, 617–18 (8th Cir.) (referencing 18 U.S.C. §§ 3664(f)(2) and (3)), *cert. denied*, 528 U.S. 909, 120 S.Ct. 255, 145 L.Ed.2d 214 (1999). A sentencing court can order "a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." 18 U.S.C. § 3664(f)(3)(A). A court also may order nominal periodic payments if "the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 U.S.C. § 3664(f)(3)(B). In considering the

receive notice of both factual and legal grounds for departure. The opinion did not analyze or discuss the issue presented here—whether notice given at the outset of the sentencing hearing is sufficient where

defense counsel has a meaningful opportunity to comment.
*United States v. Hernandez*, 251 F.3d 1247, 1251 n. 4 (9th Cir.2001).

manner and schedule of payment, the court is required to consider the defendant's financial resources, assets, projected income, and financial obligations. *See* 18 U.S.C. § 3664(f)(2)(A-C). Thus, the district court has substantial discretion in determining how restitution is to be paid.

Callan argues that neither his current economic circumstances nor those in the foreseeable future allow for full restitution under a payment plan; therefore, the trial court should have imposed nominal periodic payments. The district court determined that the defendant did not have the ability to pay interest and, consequently, waived interest on the restitution. The district court had this to say about the defendant's earning ability:

> ... I find it difficult to conclude that Mr. Callan should be allowed to simply continue a varied and eclectic educational [course] at the University of Louisville when he has caused so much damage, that nominal payments are the only recourse left. I think that Mr. Callan has been employed in the past and is capable of being employed in the future, and that nominal payments would be inappropriate.

J.A. at 770.

In *United States v. Crandon,* 173 F.3d 122 (3rd Cir.), *cert. denied,* 528 U.S. 855, 120 S.Ct. 138, 145 L.Ed.2d 118 (1999), the Court found that imposition of full restitution costs on the defendant was not an abuse of discretion, despite the defendant's claim that neither his current economic circumstances nor those in the foreseeable future allowed for full payment. Like the defendant in *Crandon,* because Callan has a college education (having completed 220 credit hours as of April 1999) and his financial future is "not bereft of hope," his potential earning capacity precludes a determination of indigency required for the imposition of nominal periodic payments. *Id.* at 126–27. Accordingly, we affirm the district court's restitution order.

### IX.

For the foregoing reasons, we find no reversible error and AFFIRM the district court's judgment in all respects.