UNITED STATES of America, Plaintiff–Appellee,

v.

Michael David BOOTH, Defendant– Appellant.

United States of America, Plaintiff–Appellee,

v.

Louis Robert Bories, Defendant– Appellant.

United States of America, Plaintiff–Appellee,

v.

Michael David Booth, Defendant– Appellant.

Nos. 01–30081, 01–30086, 01–30105.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 2002.

Filed Oct. 25, 2002.

568

Jeffry K. Finer, Finer & Pugsley, P.S.; Gerald R. Smith, Federal Defenders of Eastern Washington and Idaho; Spokane, WA, for appellants.

Thomas O. Rice, Assistant United States Attorney, Spokane, WA, for appellee.

Before CANBY, JR., KLEINFELD, and McKEOWN,* Circuit Judges.

## OPINION

CANBY, Senior Judge.

Louis Bories and Michael Booth were convicted of wire fraud, 18 U.S.C. § 1343, and Booth was also convicted of money laundering, 18 U.S.C. § 1956. Both now appeal, challenging the sufficiency of the evidence as well as a variety of the district court's evidentiary rulings and sentencing determinations.[1] We affirm both defendants' convictions and the district court's evidentiary rulings. We also affirm Bories' sentence. We vacate Booth's sentence and remand for resentencing, however, because Booth was not given sufficient notice of the grounds that the district court relied upon for an upward departure in his sentence.

### Facts and Procedural Background

Booth and Bories began working for LeasX, Inc. ("LeasX") in mid–1997. At that time, LeasX was apparently a legitimate business, offering brokering and discounting services to businesses seeking to lease durable equipment. LeasX would find investors willing to buy the desired equipment and lease it to LeasX's clients. Shortly after Booth and Bories joined the organization, the owners of LeasX sold their interests to Booth. As owner, Booth was effectively in charge of the operation; his nominal position, however, was that of director, and Bories was president. LeasX also had ten other employees.

Between December 1997 and January 1999, the date of indictment, LeasX contracted with five companies, several of whom were in financial difficulties, to find them a total of some $393.3 million in financing, sometimes promising funding within one or two days. LeasX found funding for only one lease of $100,000 during this period. LeasX received advance fees totaling nearly $2 million. Although the advance fees were represented to be refundable if a satisfactory funding source was not secured, Booth and Bories spent the fees as they came in, on salaries for employees and for their own personal expenses, including, among other things, the rental of a jet airplane, automobile leases, jewelry, trips to Las Vegas, and golf les-

---

* Judge McKeown was drawn to replace the Honorable Henry A. Politz, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation. She has read the briefs, reviewed the record, and listened to the tape of oral argument held on February 5, 2002.

1. Booth also appealed the revocation of his supervised release, which occasioned a sentence of 12 months imprisonment to be served consecutively to his sentence for wire fraud and money laundering. Booth has neither briefed nor argued this appeal. He has thus waived any challenge to the revocation and sentence, and we accordingly affirm that judgment.

sons. The money was spent in numerous cash or check transactions.

The only money that was ever returned to a client was $5,000 out of an advance fee of $96,036. Although Booth was clearly the leader of the fraudulent operation, Bories was substantially involved as well, making promises to clients and signing documents in connection with the scheme.

At trial, both defendants acknowledged LeasX's dismal record of finding financing for the clients and conceded that they had spent the advanced fees they received. Booth argued that there was no fraudulent intent; instead, he had simply made bad business decisions and the business had failed. Bories's defense was that, whatever Booth's intent, Bories did not intend to defraud and did not realize that Booth was doing so.

The jury found both defendants guilty of some of the fraud charges, but acquitted them on others. Booth was convicted of money laundering charges as well. Both defendants were acquitted of conspiracy. At sentencing, the district court adjusted Booth's offense level upward four levels for his role as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1(a). The court adjusted Bories' offense level upward by two levels for his role as "leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). The district court also imposed an upward departure of two levels on Booth for preying on desperate clients and betraying their hopes, and causing emotional impact and harm to the victims which Booth had reason to foresee.

## Discussion

### I. Trial Issues

*Money Laundering Instruction*

■ Booth contends that the indictment and instructions on the money laundering charges were flawed in that they permitted conviction if the jury found that the money laundering transactions were intended *either* to conceal the sources of money *or* to promote an illegal scheme. We reject this contention.[2]

Booth's argument focuses on two clauses of the money laundering statute, which we italicize:

**§ 1956. Laundering of monetary instruments**

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) *with the intent to promote the carrying on of specified unlawful activity; or*

\* \* \* \*

(B) *knowing that the transaction is designed in whole or in part—*

(i) *to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .*

18 U.S.C. § 1956(a)(1)(A)(i) and (B)(ii).

■ It is apparent from the disjunctive "or" in the above statute that the crime may be committed with either of the two specified states of mind. Booth's indictment, however, did not plead the two states of mind disjunctively; it alleged conjunctively that Booth conducted the unlawful financial transactions "with the intent

---

**2.** We review de novo the question whether a jury instruction misstated the elements of a statutory crime. *United States v. Castellanos–Garcia,* 270 F.3d 773, 775 (9th Cir.2001).

to promote the carrying on of the specified unlawful activity *and* knowing that the transaction was designed ... to conceal and disguise" the proceeds. (Emphasis added). When Booth's case was submitted to the jury, the instructions reverted to the disjunctive form: the jury was permitted to convict if it found that Booth had conducted the money laundering transactions *either* with the intent to promote the unlawful activity *or* knowing that the transactions were designed to conceal.

■ There was no reversible error in this sequence of events. When a statute specifies two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count and proof of any one of those conjunctively charged acts may establish guilt. *United States v. Urrutia*, 897 F.2d 430, 432 (9th Cir.1990); *United States v. Bettencourt*, 614 F.2d 214, 219 (9th Cir.1980) ("[A] jury may convict on a finding of any of the elements of a disjunctively defined offense, despite the grand jury's choice of conjunctive language in the indictment."); *see also United States v. Miller*, 471 U.S. 130, 134–38, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (no fatal variance when jury convicts on proof of only one of several means of committing crime that were alleged in the indictment, so long as indictment gave clear notice of charges to be defended against).

Booth argues that the money laundering statute sets forth two distinct crimes, not merely two means of committing one crime. Nothing in the words or structure of § 1956 supports that argument, however. Booth relies on the Seventh Circuit's decision in *United States v. Jackson*, 935 F.2d 832 (7th Cir.1991), which observed that the two subsections dealing with state of mind "are aimed at different activities"—plowing back unlawful proceeds to promote the illegal activity, and hiding the proceeds of that activity. *Id.* at 842. But in *Jackson* the jury instruction under which the defendants were convicted was in the conjunctive; it required the jury to find *both* an intent to promote the activity and a knowing purpose of concealment. The Seventh Circuit noted that the instruction was erroneous:

> The statute, however, only requires proof of one *or* the other. The fact that the government imposed an additional burden on itself does not warrant a reversal.

*Id.* at 842. Our circuit was later faced with the same situation, and we cited *Jackson* for the proposition that, by offering a conjunctive instruction on money laundering, the government had merely imposed an additional (but unnecessary) burden on itself. *United States v. Savage*, 67 F.3d 1435, 1440 (9th Cir.1995).

Booth is similarly not aided by *United States v. Gaddis*, 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976). *Gaddis* is merely one of a series of cases holding that one may not be charged, convicted and punished for two closely-related crimes set forth in the same statute, when Congress clearly did not intend that result. Accordingly, a defendant who robbed a bank could not be convicted both of the robbery, and of receiving the proceeds of the robbery; Congress was aiming at two different kinds of actors in that statutory scheme—those who rob, and those who receive proceeds from those who rob. *See id.* at 547–48, 96 S.Ct. 1023; *see also United States v. Oropeza*, 564 F.2d 316, 323 (9th Cir.1977) (a person cannot be convicted of distribution and possession of the same narcotics); *United States v. Ortiz–Martinez*, 557 F.2d 214, 216 (9th Cir.1977) (a person cannot be convicted of both illegal entry and illegal re entry after deportation, when both charges stem from a single entry). Booth's case is quite distin-

guishable from *Gaddis* and its progeny; Booth faces no threat of double punishment, and the two clauses of the money laundering statute are not aimed at different actors. Indeed, we have recognized that a single transaction may be undertaken both to promote illegal activity and to conceal proceeds. *See Savage,* 67 F.3d at 1440.

Finally, Booth argues that the disjunctive instruction permitted the jury to convict him without unanimously finding either mental state. Booth did not ask for a specific unanimity instruction, however. He asked instead that the jury be instructed that, in order to convict, it had to find *both* mental states. His proposed instruction would have required the government to bear the additional and unnecessary burden described in *Jackson,* 935 F.2d at 842, and *Savage,* 67 F.3d at 1440. The district court did not err in refusing to give Booth's requested instruction. The court did instruct the jury generally that its verdict must be unanimous. It was not plain error for the court to do no more. *See United States v. Navarro,* 145 F.3d 580, 584–89 (3d Cir.1998).

## The Exclusion of Polygraph Evidence

 The remaining contentions of trial error may be dealt with more summarily. The district court did not err by excluding the testimony of a polygrapher offered by Bories.[3] The polygrapher would have testified that a polygraph test he conducted on Bories indicated that Bories was being truthful when he denied intent to defraud or knowledge of fraud. The district court properly excluded the testimony under Fed.R.Evid. 704(b), which

prohibits an expert in a criminal case from stating "an opinion or inference as to whether the defendant did or did not have the mental state ... constituting an element of the crime charged or of a defense thereto." *See Campos,* 217 F.3d at 711. Having excluded the testimony under Rule 704(b), the district court was not required to pursue the admissibility of the testimony under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). A district court is "free to reject the admission of polygraph evidence on the basis of any applicable rule of evidence without analyzing all other potential bases of exclusion." *United States v. Benavidez–Benavidez,* 217 F.3d 720, 724 (9th Cir.), *cert. denied,* 531 U.S. 903, 121 S.Ct. 242, 148 L.Ed.2d 174 (2000).

## Brady *Claims*

 Booth urges two alleged violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[4] A *Brady* violation occurs when the prosecutor suppresses evidence that is favorable to the accused and prejudice ensues. *United States v. Ciccone,* 219 F.3d 1078, 1084–85 (9th Cir.2000) (citing *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Booth's claims do not meet this standard.

 First, Booth contends that the government failed to produce information gathered in FBI interviews of numerous individuals who "recalled denying knowledge" of Booth's alleged crimes. Booth has not identified these individuals (although he apparently knows who they are) and it appears that they did not play any

---

3. We review a district court's decision to exclude expert testimony for abuse of discretion. *United States v. Campos,* 217 F.3d 707, 710 (9th Cir.), *cert. denied,* 531 U.S. 952, 121 S.Ct. 357, 148 L.Ed.2d 288 (2000).

4. We review claims of *Brady* violations de novo. *United States v. Ciccone,* 219 F.3d 1078, 1085 (9th Cir.2000).

role in the trial. Any failure to turn this material over to Booth could not have prejudiced him, because there is no reasonable probability that placing these recollected denials of knowledge in his hands would have changed the result of the trial. *See Downs v. Hoyt,* 232 F.3d 1031, 1037 (9th Cir.2000).

■ The only specific information that Booth identifies that was not provided to him was a report of a hotel search, by which Booth hoped to establish that he was not residing at that hotel. This fact, however, was established by testimony of witnesses at trial. There is accordingly no reasonable probability that this evidence, to the extent it was exculpatory and withheld from Booth, would have changed the outcome of the case. The district court did not err in refusing Booth's motion to dismiss for failure to produce exculpatory evidence.

■ Booth also contends that the prosecution's failure to review a particular FBI agent's personnel file for potential impeachment evidence was a *Brady* violation under *United States v. Henthorn,* 931 F.2d 29 (9th Cir.1991). This agent had no role in investigation of the case and was not a potential government witness; he was stationed in London, England, and was the landlord of one of Booth's victims. Because the agent played no role in the case, there was no *Henthorn* violation. *See United States v. Calise,* 996 F.2d 1019, 1021 (9th Cir.1993); *see also United States v. Jennings,* 960 F.2d 1488, 1489 (9th Cir. 1992) ("the government has a duty to examine the personnel files of law enforcement officers *it intends to call as witnesses* if a defendant requests production of the files") (emphasis added). The dis-

trict court did not err in denying Booth's *Henthorn* motion.

### *Failure to Preserve the Hard Drives of Booth's Computers*

After Booth's arrest, a private vendor repossessed his computers and erased the hard drives, after the government informed the vendor that it did not need copies of the information on the hard drives. Booth argues that these computers contained information showing that he had sought funding for his client's leases, and that the government violated its duty to preserve exculpatory evidence. *See California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

■ There was nothing about the hard drives, however, that would have made their allegedly exculpatory nature apparent to the government. Moreover, there is no evidence that the government ever possessed the computers; the hard drives were as accessible to Booth as to the government. The prosecution's duty to preserve evidence applies only to "material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and that is of such nature that the defendant cannot obtain comparable evidence from other sources." *Cooper v. Calderon,* 255 F.3d 1104, 1113 (9th Cir.2001). In addition, the government's failure to preserve potentially useful evidence rises to a due process violation only where the "criminal defendant can show bad faith." *Id.* at 1113–14. Neither of these requirements is met here; there was no *Trombetta* violation.

### *Sufficiency of the Evidence*

■ Booth and Bories both challenge the sufficiency of the evidence of their intent to defraud.[5]

---

**5.** We review de novo the sufficiency of the evidence. *United States v. Antonakeas,* 255

F.3d 714, 723 (9th Cir.2001). There is sufficient evidence to support a conviction if, "af-

Booth's and Bories' intent to defraud can be proved through circumstantial evidence. *See Ciccone,* 219 F.3d at 1084. There was evidence that the two received money, represented to be refundable, from their clients that was purportedly for securing leases, but they promptly spent the money on themselves instead. This is circumstantial evidence of fraud. *See United States v. Rude,* 88 F.3d 1538, 1549 n. 10 (9th Cir.1996) ("[T]he government may, in a fraud case, prove that the defendants did not use the funds obtained for their intended purpose."); *United States v. Brutzman,* 731 F.2d 1449, 1452 (9th Cir.1984) ("The misuse of the funds directly established the fraudulent nature of the scheme."), *overruling on other grounds recognized by United States v. Trinh,* 60 F.3d 835 (9th Cir.1995) (unpublished disposition). The large sums of money taken in by LeasX, the failure of LeasX to provide any leases greater than $100,000.00 when the defendants were promising leases of millions of dollars to numerous clients, the free spending of supposedly refundable funds by the defendants and the personal involvement of both defendants in the transactions together provide more than sufficient evidence to allow a rational trier of fact to find that they intended to defraud their clients.

We also reject Bories' contention that the evidence was insufficient because the verdicts were inconsistent. We review the sufficiency of the evidence on each count independently, without regard for the consistency of the verdicts on different counts. *United States v. Blitz,* 151 F.3d 1002, 1007 (9th Cir.1998). There was sufficient evidence on each count of conviction of each defendant.

## II. Sentencing Issues

### Bories' Offense Level

Bories contends that his offense level should have been based only on the monetary loss resulting from the offenses of which he was convicted. But the district court correctly determined that it was required to take into account the entire loss inflicted by the common scheme. *See United States v. Lawrence,* 189 F.3d 838, 844 (9th Cir.1999); U.S.S.G. § 2F1.1 comment. n. 7. The district court accordingly did not err in raising Bories' offense level by 11 levels for the amount of loss.

### Restitution

Both defendants appeal the district court's restitution orders.[6] Bories challenges the total amount he has been ordered to pay and the district court's failure to apportion the total between him and Booth. We reject both challenges.

The district court did not abuse its discretion in ordering restitution from Bories for the entire amount of loss caused to victims of the scheme. The mandatory restitution provision of the Victim Witness Protection Act defines a victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by

---

ter viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

**6.** A restitution order is reviewed for abuse of discretion if it is within the bounds of the statutory framework. *United States v. Lawrence,* 189 F.3d 838, 846 (9th Cir.1999). We review factual findings supporting the restitution order for clear error. *Id.*

the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). The crimes of wire fraud of which Bories was convicted require proof of a "scheme or artifice to defraud." 18 U.S.C. § 1343. Those offenses therefore qualify as ones for which restitution may be ordered for all persons directly harmed by the entire scheme. *United States v. Johnson,* 132 F.3d 1279, 1287 (9th Cir.1997). Restitution is thus not confined to harm caused by the particular offenses of which Bories was convicted. *Lawrence,* 189 F.3d at 846. The losses from the scheme calculated by the district court are sufficiently supported by the facts in the record.[7] We find no error.

■■■ Bories also appeals the district court's failure to apportion the restitution total between Booth and Bories to reflect their respective roles in the fraud. The court had the discretion to apportion the total, but was not required to do so. *See* 18 U.S.C. § 3664(h). The record reflects that the court knew it had this option, but decided not to exercise it. *Cf. United States v. Walton,* 217 F.3d 443, 451 (7th Cir.2000) (remanding for clarification where the district court indicated that it had no choice but to impose liability for the total amount). Although Bories contends that he was merely Booth's "errand boy," there was sufficient evidence to support the district court's finding that Bories played an essential role in the fraudulent scheme. Accordingly, we find no abuse of discretion in the court's decision to hold Booth and Bories jointly and severally liable for the restitution payments.

■■ Booth challenges his payment schedule. He concedes that restitution is mandatory for fraud, and that in setting the total amount the court may not take his economic circumstances into account. *See* 18 U.S.C. §§ 3663A, 3664(f)(1)(A). He points out, however, that the sentencing court must take his financial circumstances into account in setting a schedule of payments. *See* 18 U.S.C. § 3664(f)(2). He urges that, because his circumstances do not permit any payment, he should have been required to make nominal payments only. *See* 18 U.S.C. § 3664(f)(3)(B).

The district court did not deviate from the statutory requirements. It recognized Booth's prior judgment obligations and his present financial difficulties, but noted that Booth had earned a living "legally for some part of the time," and set payments at $500 per month as an amount that Booth might reasonably look forward to being able to pay after his term of imprisonment. We find no abuse of discretion here.

### *Upward Adjustment for Extensive Criminal Activity under U.S.S.G. § 3B1.1*

■■ The district court increased Booth's base offense level by four levels because it found that he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *See* U.S.S.G. § 3B1.1(a). Booth is correct that there were not five or more participants; the ten employees of LeasX were not criminally responsible for the offenses committed. *See* U.S.S.G. § 3B1.1, Application Note 1 (defining "participant"). The sole question, then, is whether the scheme led by Booth was "otherwise extensive."[8]

---

**7.** Bories contends that the district court should not have included $83,032 from Avigen. Bories appears to have misread the

record; this sum was not included in the total.

**8.** We review for an abuse of discretion the district court's application of the guidelines to

The district court did not abuse its discretion in accepting the argument of the government that the scheme was extensive because of the involvement, albeit unknowing, of more than ten employees and the geographical reach of the scheme. *See United States v. Govan,* 152 F.3d 1088, 1096 (9th Cir.1998) (finding that a conspiracy was "clearly 'otherwise extensive' " because it "involved interstate travel, a large number of victims . . . as well as nearly $100,000 in robbery proceeds"); *United States v. Rose,* 20 F.3d 367, 374 (9th Cir. 1994) ("Whether criminal activity is 'otherwise extensive' depends on such factors as (i) the number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount of money fraudulently obtained or laundered.") (citations omitted). Those employees of the company who were innocent and unwitting participants are now unjustly tarred with having worked for a fraudulent enterprise.

Bories was given a two-level enhancement as a manager under U.S.S.G. § 3B1.1(c). The court found that he played an essential role in the fraud scheme and held himself out as president of the business. There was no abuse of discretion in this upward adjustment.

### The Upward Departure Resulting from Victims' "Desperation"

Booth appeals the district court's upward departure of two levels for betraying the hope of desperate individuals. He appeals the departure on two grounds: lack of adequate notice and unreasonableness. Because we conclude that there was not adequate notice, we do not reach the question whether this departure was reasonable.[9]

The Presentence Investigation Report recommended no upward departure for victim impact. Prior to sentencing, the government moved for an upward departure for the "harmfulness and seriousness" of Booth's conduct. *See* Application Note 11, U.S.S.G. § 2F1.1 (2000). The government made clear what it meant by this ground; it noted that departure on this basis might be warranted by the "reasonably foreseeable, physical or psychological harm or severe emotional trauma [or] the knowing endangerment of the solvency of one of the victims." *Id.* The government specifically cited the victim impact statements only of those victims who suffered heart attacks and insolvency.

At the sentencing hearing, Booth moved for a continuance on the ground that his attorney had not previously known of certain civil judgments for fraud that had been entered against Booth in the past and that were mentioned in the pre-sentence report. The district court denied the continuance, stating that the judgments would not be considered in sentencing.

After deferring the question of a departure until late in the sentencing proceeding, the district court stated that the physical problems of the victims were not caused by Booth, and that the financial difficulties of the victims were not necessarily entirely attributable to Booth. The district court accordingly did not depart on these grounds urged by the government. Instead, the court stated that it was departing upward because Booth had preyed upon desperate individuals, giving them hope and then betraying their trust. The court opined that this fact made the case different from the ordinary fraud, where

---

the facts of a particular case. *United States v. Antonakeas,* 255 F.3d 714, 727 (9th Cir.2001).

9. We review de novo the adequacy of notice for an upward departure from the sentencing guidelines. *United States v. Hernandez,* 251 F.3d 1247, 1250 (9th Cir.2001).

victims were often enticed by their own greed. The court also explained that Booth had knowledge of the harm he would cause in taking advantage of desperate individuals because of harm he had caused to other individuals in the past, apparently a reference to the discussion in the pre-sentence report of civil judgments against Booth.

We conclude that these new grounds were adopted without sufficient notice to Booth. *Cf. Hernandez,* 251 F.3d at 1251 n. 4 (explaining that "district courts must in any case provide notice of a potential departure not later than the outset of the sentencing hearing"). The ground that Booth preyed on desperate victims was different in kind from the ground of harm urged by the government. In addition, Booth was led to believe that his prior civil judgments would not be a ground of departure. We conclude that Booth was not given adequate notice of the upward departure. For that reason, we vacate his sentence and remand for re-sentencing. *See United States v. Hinojosa–Gonzalez,* 142 F.3d 1122, 1123 (9th Cir.1998) (lack of adequate notice of departure requires re-sentencing). Because under our general practice, Booth's re-sentencing will be a new proceeding with an open record, *see United States v. Matthews,* 278 F.3d 880, 888–90 (9th Cir.2002) (en banc), we do not reach the question whether the degree of departure was reasonable on the present record.

### *Conclusion*

For the foregoing reasons, the convictions of Booth for wire fraud and money laundering and of Bories for wire fraud are AFFIRMED. With regard to those convictions, Bories' restitution order and sentence are AFFIRMED, and Booth's restitution order is AFFIRMED, but his sentence of imprisonment is VACATED and his case REMANDED for further proceedings in accordance with this opinion. The judgment revoking Booth's supervised release and imposing a sentence in connection therewith is AFFIRMED.