**NOT RECOMMENDED FOR PUBLICATION**
**File Name:  19a0586n.06**

**Nos. 18-2113/18-2239**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Dec 03, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| XAVIER ROMER; JELCORBY T. KENT, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

**BEFORE:  BATCHELDER, WHITE, and THAPAR, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  Defendants Xavier Romer and Jelcorby Kent pleaded guilty to one count of conspiracy to commit bank fraud; Romer also pleaded guilty to one count of aggravated identity theft.  The district court sentenced Romer to a within-guidelines sentence of 60 months' imprisonment, and Kent to a within-guidelines sentence of 24 months' imprisonment.  Romer and Kent appeal their sentences, and we affirm.

**I.**

Defendants' scheme consisted of breaking into vehicles to steal purses and using the bank and credit cards, checkbooks, and identifications from the stolen purses to obtain funds from financial institutions.  Their female co-conspirators disguised themselves to look like the purse-theft victims and used the drive-through teller lanes farthest from the financial institutions to fraudulently request and obtain funds.  Due to the use of a particular drive-through lane, law enforcement referred to the members of this conspiracy as the Felony Lane Group (FLG).  The

male co-conspirators stole license plates to affix to vehicles that were used in the scheme, served as lookouts, and provided instructions to their female accomplices before and during the transactions. Romer was active in the FLG as early as November 2016 and traveled to Oklahoma, Missouri, Georgia, Alabama, and Colorado to carry out the scheme. Kent was involved as early as June 2017 and traveled to Maryland, Virginia, and Illinois.

In January 2018, Kent and others traveled from Florida to Baltimore, where they carried out the scheme at 15 to 20 financial institutions. Co-defendant Kenneth Jones, who was leading the group at the time, then announced that they would be traveling to Detroit, where they met up with Romer and two others and carried out the scheme for a few more days. Jones then flew back to Florida and the FLG moved on to Grand Rapids, Michigan, with Romer leading the group in Jones's absence because Romer had procured the stolen identifications, bank cards, and checkbooks to be used in Grand Rapids. In Grand Rapids, Romer directed the female accomplices; Kent sat in the front seat of one of the vehicles, provided a female with the stolen identification and checks, served as a lookout, and participated in stealing a license plate. Officers eventually located and stopped two vehicles and arrested eight members of the FLG, including Romer and Kent. Officers recovered, among other things, driver's licenses and credit and debit cards belonging to women residing in Michigan, Illinois, Ohio, and Indiana.

Romer, Kent, and others were indicted on charges of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344 and 1349, bank fraud in violation of 18 U.S.C. § 1344, and aggravated identity theft in violation of 18 U.S.C. § 1028A. Romer and Kent both pleaded guilty to the conspiracy count; Romer also pleaded guilty to the aggravated-identity-theft count.

Romer did not object to any portion of the presentence investigation report (PSR), which recommended a three-level enhancement for being a manager or supervisor of the criminal

activity, *see* U.S. Sentencing Guidelines Manual (USSG) § 3B1.1(b), and a two-level enhancement for relocating or participating in relocating a fraudulent scheme to evade law enforcement or utilizing sophisticated means to carry out the scheme and avoid detection, *see* USSG § 2B1.1(b)(10). Based on a total offense level of 19 and a criminal-history category of I, the guidelines range was 30 to 37 months on the conspiracy count; the aggravated-identity-theft count carried a mandatory 24-month consecutive sentence to be added to the sentence on the conspiracy count. The PSR included a proposed condition of supervised release that Romer "not be employed in any position which entails fiduciary responsibility or any employment that involves the acquisition of merchandise, funds, or services without the approval of the probation officer" due to "the nature and circumstances of [Romer's] conduct and to minimize third-party risks." R. 291, PID 1249.

In his sentencing memorandum, Romer conceded that he was a manager of the criminal activity, but characterized himself as a limited and inexperienced manager. At sentencing, Romer confirmed that he agreed with the advisory guidelines range and had no objections to the PSR, but argued that in determining an appropriate sentence the district court should consider that his stint as a manager was brief. The district court adopted the PSR without change and sentenced Romer to a within-guidelines sentence of 36 months' imprisonment on the conspiracy count, plus a mandatory consecutive sentence of 24 months' imprisonment on the aggravated-identify-theft count. The district court included the recommended supervised-release condition.

Kent objected to the PSR's recommendation to apply a two-level enhancement for relocation or sophisticated means under USSG § 2B1.1(b)(10). The government argued in part that the enhancement should apply because of "the travel aspect of this scheme, movement is life to this scheme, that's why they don't stay in Florida, that's why they don't operate in one single

area, and they have to keep swimming or this scheme sinks." R. 335, PID 1761. The district court overruled the objection:

> The nature of the conspiracy and the movement of the parties as well as the means by which these frauds were perpetrated is outlined well in the presentence investigation report. As [defense counsel] points out, it involves interstate travel, among other things. But [the government] appropriately points out that the nature of this scheme is dependant [sic] on moving around quickly, coaching of participants, sophisticated schemes on how to handle the tellers, limited amount of time in front of the tellers, and if it goes beyond that amount of time, you pull out, confusion -- deliberate confusion of the tellers, or attempted confusion of the tellers. This is well planned, and in the Court's judgment, as I've ruled on many of the other co-defendant cases, for the reasons the government states as well as others supported by the caselaw, the Court finds that the objection should be overruled.

*Id.* at PID 1762. With an offense level of 16 and a criminal-history category of II, Kent's advisory guidelines range was 24 to 30 months. The district court imposed a bottom-of-the-guidelines sentence of 24 months' imprisonment. In his sentencing memorandum Kent requested that the district court exercise its discretion to apportion restitution in recognition of Kent's lesser culpability as compared to his co-defendants. Kent did not raise the restitution issue at sentencing, however, and the district court imposed the full sum of restitution recommended in the PSR jointly and severally with Kent's co-defendants.

Romer and Kent timely appealed their sentences.

## II.

Generally, we review for abuse of discretion whether the district court's sentence was procedurally and substantively reasonable. *United States v. Albaadani*, 863 F.3d 496, 504 (6th Cir. 2017) (quoting *United States v. Solano-Rosales*, 781 F.3d 345, 351 (6th Cir. 2015)). However, "[w]here a party has failed to object to a procedural defect, we review claims of procedural unreasonableness for plain error." *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010) (citing *United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc)). Plain error entails "(1) an error, (2) that was obvious or clear, (3) that affected [the defendant's] substantial

rights, and (4) that 'seriously affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Price*, 901 F.3d 746, 749-50 (6th Cir. 2018) (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)). A sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *United States v. Young*, 847 F.3d 328, 370 (6th Cir. 2017) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

**A.**

Romer and Kent both challenge their two-level enhancements under USSG § 2B1.1(10), which provides:

> (10) If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels.

The district court adopted the PSRs' conclusion that the enhancement applies under subsections (A) and (C). Because we agree that the enhancement applies under subsection (A), we need not address Defendants' arguments regarding "sophisticated means" under subsection (C).

We review Romer's challenge for plain error because he raised no objection before the district court. Kent did object, but he focused primarily on whether his conduct constitutes "sophisticated means," while making only one conclusory statement regarding whether the relocation enhancement under subsection (A) applies.

Defendants argue that they did not relocate or participate in relocating a fraudulent scheme because the scheme was never relocated; rather, it was always intended to operate in multiple jurisdictions and always revolved around Florida, where most of the FLG—including Romer and Kent—resided. In support of their argument, Defendants primarily rely on *United States v. Hines-Flagg*, 789 F.3d 751 (7th Cir. 2015). In *Hines-Flagg*, the defendants traveled from Detroit to other states to fraudulently open credit-card accounts and buy merchandise, but they "procured all the fraudulent identities, created the fake identifications, and fenced the stolen merchandise all in Detroit." *Id.* at 753-54, 756. The Seventh Circuit reversed the district court's application of the relocation enhancement, noting that the "scheme was always meant to operate in multiple locations, with Detroit as its home base," and the "plan was always that the stolen merchandise would be returned to and fenced in Detroit. Detroit was the hub of Hines-Flagg's operations and the temporary trips to other states operated as spokes." *Id.* at 755-56.

Defendants also cite *United States v. Morris*, 153 F. App'x 556 (11th Cir. 2005). In *Morris*, the Eleventh Circuit declined to apply the relocation enhancement where the members of the conspiracy operated a fraudulent credit-card scheme primarily in the Atlanta area but sometimes traveled out of town; however, they always returned the goods to a co-conspirator in Atlanta, who would sell the goods from his home in Atlanta. *Id.* at 557-58. The court emphasized Atlanta's centrality to the scheme and that the fraudulently obtained merchandise was always delivered to and eventually sold from the same residence in Atlanta. *Id.* at 558.

We considered both of these cases in *United States v. Thornton*, 718 F. App'x 399, 400 (6th Cir. 2018), which involved the defendants stealing checks from businesses' mailboxes, using the stolen checks to create counterfeit checks, and "fleec[ing] local banks for a day or two before moving on to another town." We explained that "the relocation enhancement applies where travel

to other jurisdictions was a key component of a fraud scheme," and that "[r]elocation need not be motivated by a specific threat of arrest as opposed to a more general intent to evade law enforcement." *Id.* at 403-04 (internal quotation marks and citations omitted). In affirming the district court's finding that the relocation enhancement applied, we distinguished *Hines-Flagg* and *Morris* because the defendants in those cases always returned to a home base that was central to the conspiracy. *Id.* at 404-05. Unlike those cases, "[t]he conspiracy at issue [in *Thornton*] did not include a home base of operations. Instead, as the district court found, the scheme moved with the conspirators from town to town." *Id.* at 405.

Even if we were to find the out-of-circuit precedent persuasive, *Thornton* is more analogous to this case. As in *Thornton*, the scheme in this case also moved with the conspirators. The conspirators stole purses outside of Florida, stole license plates outside of Florida, bought disguises outside of Florida, and used the stolen identifications and financial instruments to defraud financial institutions outside of Florida. When the leader of the group had to return to Florida, Romer, who was on scene in Michigan, was put in charge. Thus, unlike *Hines-Flagg* and *Morris*, in this case Defendants completed each act of the scheme—stealing purses and license plates, donning disguises, and procuring funds from financial institutions—in other jurisdictions. *See also United States v. Hessa*, 464 F. App'x 473, 475 (6th Cir. 2012) ("Hessa's actions fall within the plain language of the enhancement. He admitted that he traveled to numerous states making fraudulent returns at J.C. Penney stores."); *United States v. Savarese*, 686 F.3d 1, 15 (1st Cir. 2012) ("The theft and fraudulent use of the credit cards . . . comprised the heart of the enterprise. Their transitory nature does not undermine their centrality to the scheme, and conversely, the fact that other tangential elements recurred in a convenient geographic locale does

not necessarily render that location the scheme's effective hub." (internal quotation marks omitted)).[1]

Romer also argues that he and the rest of the FLG did not travel to other jurisdictions to evade law enforcement as required for the enhancement to apply, but rather moved around as part of their modus operandi. Romer Br. at 9-10. We have "previously rejected similar 'method of operation' arguments." *Thornton*, 718 F. App'x at 405 (citing *Hessa*, 464 F. App'x at 475; *United States v. Lyles*, 506 F. App'x 440, 448 (6th Cir. 2012)). Here, because the FLG traveled frequently in order to carry out its scheme at different locations, it is not plainly erroneous to conclude that "[t]he logical explanation for [Romer's] interstate travel is that he traveled between multiple [cities, states, and financial institutions] to avoid detection." *Hessa*, 464 F. App'x at 475.

**B.**

Romer also challenges his three-level enhancement under USSG §3B1.1(b) for being a "manager or supervisor (but not an organizer or leader)" of the criminal activity where "the criminal activity involved five or more participants or was otherwise extensive." Because Romer did not object to this enhancement, we review for plain error.

Romer argues that the enhancement should not apply because he was a manager or supervisor for only one day and that his role was otherwise more limited. During that one day, Romer was in charge of at least seven other participants, leading them from Detroit to Grand Rapids, providing them with the documents needed to defraud the banks, selecting the banks,

---

[1] It is not clear whether Kent intended to raise a separate substantive-reasonableness challenge to his sentence. Although he asserts that the sentence is substantively unreasonable, his primary argument is that he should have been sentenced at the low end of the properly calculated guidelines range. Because we find that his guidelines range was properly calculated, this argument fails. Kent has not otherwise overcome the presumption that his within-guidelines sentence is substantively reasonable. *See Vonner*, 516 F.3d at 389.

giving directions during the fraudulent transactions, and collecting the money. This activity plainly constitutes acting as at least a manager or supervisor, a conclusion Romer does not dispute.

We are not persuaded by Romer's argument that the district court committed plain error by applying a three-level enhancement to Romer even though he led the group for only a single day. Neither the guidelines nor the commentary explicitly mentions a temporal factor in determining whether the enhancement applies. Although Romer cites two cases standing for the proposition that a district court may consider duration to decrease an enhancement, *see United States v. Penaloza*, 648 F. App'x 508, 514 (6th Cir. 2016) (affirming under a "deferential" standard of review the district court's one-point role enhancement where "the district court appropriately took this brevity into account in applying only a one-level enhancement" rather than the requested three-level enhancement); *United States v. Jones*, 454 F.3d 642, 652 (7th Cir. 2006) ("The fact that he was found to occupy the role for a short while was reflected in the court's decision to add only two points under 3B1.1(c), not the three points requested by the government under 3B1.1(b)."), these cases do not support finding that the district court plainly erred by applying a three-level enhancement under these circumstances.

## C.

Next, Romer argues that the district court committed plain error by including as a condition of supervised release that Romer "not be employed in any position which entails fiduciary responsibility or any employment that involves the acquisition of merchandise, funds, or services without the approval of the probation officer." R. 297, PID 1318. A district court may impose a special condition of supervised release if the condition meets the following requirements:

> First, the condition must be "reasonably related to" several sentencing factors. These factors are "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from

> further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner." Second, the condition must "involve[ ] no greater deprivation of liberty than is reasonably necessary for" several sentencing purposes. These purposes are "to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner." Third, the condition must be "consistent with any pertinent policy statements issued by the Sentencing Commission." Because they are written in the conjunctive, a condition must satisfy all three requirements. However, a condition need not satisfy every single factor and purpose within each of the first two requirements.

*United States v. Carter*, 463 F.3d 526, 529 (6th Cir. 2006) (alterations in original) (citations and footnote omitted).

Romer challenges the latter part of the condition, arguing that the condition's use of the term "employment"—in contrast to "position" used earlier in the condition—means that Romer cannot work for any company that acquires merchandise, funds, or services. According to Romer, this condition is unconstitutionally overbroad and vague and prevents him from seeking "employment in nearly any commercial or retail business." Romer's Br. at 27. Further, this overbreadth and vagueness shows that the condition is not reasonably related to the offense. *See* 18 U.S.C. § 3583(d)(1).

The government reads the condition differently and argues that the condition "is limited to jobs that involve acquiring goods and services as distinguished from providing goods and services, and the prior-approval condition means that it is not a ban at all." Appellee's Br. at 22-23. The government also notes that the PSR explained the reason for this condition, i.e., that it was included due to "the nature and circumstances of [Romer's] conduct and to minimize third-party risks." R. 291, PID 1249. Thus, according to the government, the condition is also reasonably related to the offense.

Although the condition is not a model of clarity, applying plain-error review, it is reasonably construed as requiring Romer to secure probation approval before working in a position where he would be the person acquiring—not merely handling—merchandise, funds, or services. *See United States v. Zobel*, 696 F.3d 558, 575 (6th Cir. 2012). This interpretation is strengthened by the context of the condition—the challenged condition is coupled with preventing Romer from acting in a fiduciary role in his employment. It is also supported by the reasons the condition was imposed—the nature and circumstances of the offense involved Romer's acquiring money through misrepresentation and impersonation. Thus, reading the condition "in a commonsense way," the condition is not clearly or obviously impermissibly vague or overbroad.[2] *United States v. Shultz*, 733 F.3d 616, 624 (6th Cir. 2013). And, as the government points out, to the extent that Romer later believes that probation is being too restrictive in its interpretation of this provision, "he may petition the court to 'modify [or] reduce . . . the condition[ ] of supervised release.'" *United States v. Arnold*, 549 F. App'x 491, 498 (6th Cir. 2013) (alterations in original) (quoting 18 U.S.C. § 3583(e)(2)); *see also Zobel*, 696 F.3d at 575.

## D.

Lastly, Kent argues that the district court abused its discretion by not apportioning restitution among the defendants based on culpability, and opting instead to order joint and several restitution.[3] Kent's Br. at 18-19. *See United States v. Williams*, 612 F.3d 500, 509 (6th Cir. 2010) ("[T]he amount of restitution ordered by the district court is reviewed under the abuse-of-discretion standard." (citation omitted)). "In cases involving multiple defendants, [18 U.S.C.] § 3664(h)

---

[2] Romer also points out that there appears to be no caselaw addressing this condition. But this argument supports our conclusion that the district court did not commit plain error by imposing the condition. *See United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) ("A lack of binding case law that answers the question presented will also preclude our finding of plain error." (citing *United States v. Woodruff*, 735 F.3d 445, 450 (6th Cir. 2013))).

[3] Kent does not argue that the district court committed procedural error by not addressing the argument.

explicitly gives district courts discretion as to whether they should apply joint and several liability or whether liability should be apportioned among the defendants based on their economic circumstances and their respective contributions to the victims' losses." *United States v. Bogart*, 576 F.3d 565, 575 (6th Cir. 2009) (quoting *United States v. Hunt*, 521 F.3d 636, 649 (6th Cir. 2008)); *see also* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

Kent raised this argument in his sentencing memorandum, albeit very briefly, stating that "Mr. Kent asks the Court to exercise its discretion under 18 U.S.C. § 3664(h) and apportion restitution to account for his lesser culpability and lack of leadership in this offense." R. 309, PID 1352. He did not raise this argument at sentencing. After addressing many of the § 3553(a) factors, including the seriousness of the offense, the district court ordered Kent to pay $93,854 in restitution, amounting to the total undisputed fraud loss calculated by probation. "Having assessed [Kent's] ability to pay," the district court ordered that Kent pay small installments while in prison and $200 per month starting 60 days after his supervised release commences. R. 335, PID 1773. The district court waived the interest requirement and a fine due to Kent's inability to pay.

The district court then asked whether Kent had "[a]ny legal objection to the sentence imposed." *Id.* Kent's counsel responded, "Just the one that's been made," presumably referring to his objection to the two-level enhancement for relocation or sophisticated means. *Id.* Kent's counsel then affirmed that he was satisfied that the district court had "addressed all of [his] arguments on the record." *Id.* at PID 1774. Then, "[f]or clarification," the government asked whether "the restitution will be ordered joint and several with the other defendants." *Id.*

The district court responded, "Oh, indeed.  Thank you."  *Id.*  After advising Kent of his right to appeal, the district court asked whether there was "[a]nything further."  *Id.* at PID 1775.  The government and Kent's counsel both responded in the negative.

On appeal, the parties dispute whether Kent adequately preserved his objection to restitution being imposed jointly and severally.  We need not decide this question because it makes no difference to the outcome; the district court did not abuse its discretion in ordering restitution to be joint and several with Kent's co-defendants.  In arguing that the district court abused its discretion, Kent stresses that he had a "relatively menial role in this offense" compared to his co-defendants.  Kent's Br. at 19.  However, Kent was involved in the FLG as early as June 2017 and traveled to several states, including Michigan, Maryland, Virginia, and Illinois.  On the Michigan trip, Kent sat in the front seat of one of the vehicles, provided a female with the stolen identification and checks, served as a lookout, and participated in stealing a license plate, all activities essential to the scheme.  And, in any event, even if Kent's role was relatively menial, this alone would not support finding an abuse of discretion.  *See United States v. Sawyer*, 825 F.3d 287, 295-96 (6th Cir. 2016) ("Section 3664(h) specifically empowers district courts to make individual defendants liable for all of the losses caused by multi-defendant crimes, and we have consistently affirmed such decisions in the conspiracy context.").  Although "the district court has the option under § 3664(h) to apportion the restitution payment among defendants, a district court is not required to do so."  *Bogart*, 576 F.3d at 576 (citing *United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002)); *see also United States v. Williams*, 612 F.3d 500, 513 (6th Cir. 2010) ("Thus, by participating in a conspiracy to commit healthcare fraud, Williams bore the risk of becoming financially responsible for the entire amount of the conspiracy victims' losses.  The restitution order in his case may well be disproportionate when compared to that of his

codefendants, but when compared to the losses sustained by the innocent victims of the conspiracy, Williams has no basis to complain.").

Kent's argument that the district court should have apportioned restitution due to his limited means to pay also fails. Although Kent did not raise this argument to the district court, the district court expressly considered Kent's ability to pay in setting a payment schedule and waiving a fine and interest on the restitution. Further, the district court noted that Kent would have the opportunity to obtain his GED, and that he was interested in welding and could obtain vocational training while in prison. We find no abuse of discretion in the district court's determination.

## III.

For the reasons set out above, we affirm.