UNITED STATES of America,
Plaintiff–Appellee,

v.

Doris JOHNSON–WILDER,
Defendant–Appellant.

No. 92–2677.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1994.

Decided July 1, 1994.

Barry R. Elden, Asst. U.S. Atty., Crim.
Receiving, Appellate Div., Joseph D. Heyd
(argued), Office of the U.S. Atty., Chicago,
IL, for plaintiff-appellee.

Adam Bourgeois (argued), Chicago, IL, for
defendant-appellant.

Before MANION, KANNE, and
ROVNER, Circuit Judges.

KANNE, Circuit Judge.

Claudette Grimes was the supervisor of
the accounts payable department of Conti-
nental Grain Company, and had access to
blank checks belonging to her employer. In
October of 1988 Grimes and her friend Doris
Johnson–Wilder decided to put this access to

work by embarking on an illegal joint venture. Grimes, they decided, would steal a check, forge the signatures and make it out to Wilder, who would cash the check and split the proceeds with Grimes. They agreed that Grimes would get one fourth of the proceeds, and Wilder, three fourths.

They put their plan into action in November 1988. Grimes stole a check, and forged the necessary two signatures on it. She made it out to Wilder in the amount of $49,253.62. Grimes handed the check over to Wilder, who deposited it into her savings account. Three days later Wilder began moving the money into other accounts, and spending it. She deposited $10,000 in Steel City National Bank, giving the bank a false social security number when she opened the account.

In December of 1988 Grimes and Wilder decided to forge another check, this time for substantially more money. Wilder persuaded Grimes to make the check out to a business, Sweetcakes Old Fashion Donuts, which was owned by a relative of Wilder's named Sherman Brown. Brown was having financial troubles, so he was willing to take the risk of having the check made out to him.

Grimes stole a second blank check, forged the signatures, and made it out to Sweetcakes in the amount of approximately $389,000. Grimes delivered the check to Wilder, who delivered it to Brown, who deposited it. There were various problems with the division of the money, which need not concern us here. Wilder ended up getting some portion of the money from Brown.

Wilder attempted to buy a car with the stolen money and put a false social security number on the credit application. Wilder opened a money market account with one of the checks she received from Brown, and used a false social security number in the documents she provided to the bank. Grimes attempted to buy a house, and Wilder assisted her in providing false information to a potential mortgage lender.

By the end of January 1989, Continental Grain had discovered the forged checks. They notified Harris Bank, which froze the funds remaining in the various accounts. Wilder had received over $150,000 from the two checks, about half of which was recaptured when the accounts were frozen.

A grand jury returned a six count indictment against Wilder, Grimes, and Brown. Wilder was named in two counts of using false social security numbers in violation of 42 U.S.C. § 408(a)(7)(B), and three counts of bank fraud in violation of 18 U.S.C. § 1344. Prior to her trial, Wilder's first attorney withdrew and she secured a new one, who tried the case. One of the bank fraud counts against Wilder was dropped by the government. Brown and Grimes pleaded guilty to the charges against them.

Wilder was tried before a jury in February 1992. The government put on evidence consisting of the testimony of several witnesses, including Grimes, as well as documents and telephone records showing that Wilder had made numerous calls to Grimes.

Wilder put on a case in her defense consisting of three witnesses, and she also testified. She claimed that the first check was a business loan made to her by an individual named Al Smith. She claimed the money paid to her by Brown was for business services she provided to Brown. She did not call Brown as a witness. Wilder admitted to knowing Grimes, but denied planning the check forgery scheme. She admitted to using false social security numbers, but claimed that she did so to hide her financial information from her estranged husband. The government rebutted these claims with a witness who had overheard telephone calls between Wilder and Grimes, and with documents which demonstrated the nonexistence of "Al Smith."

The jury found Wilder guilty. She was sentenced to 37 months of imprisonment on each of the four counts (to run concurrently) followed by a period of supervised release of three years. Wilder was also ordered to pay restitution in the amount of $129,840.46. This appeal followed.

Wilder challenges her conviction on four grounds. She argues that: (1) there was insufficient evidence to convict her on each of the four counts, (2) the district court committed plain error by omitting an instruction to

the jury regarding co-conspirator statements, (3) her trial counsel rendered constitutionally ineffective assistance at trial, and (4) the district court abused its discretion in ordering restitution.

## Sufficiency of Evidence

Wilder has a tough standard to meet to convince us that there was insufficient evidence to convict her. In *United States v. Maholias*, 985 F.2d 869, 874 (7th Cir.1993) we held that we would affirm a conviction if

> the evidence, viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... The evidence need not be inconsistent with every reasonable hypothesis of innocence in order to sustain the conviction, ... and we will not reweigh the evidence or reweigh the credibility of witnesses.

And in *United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988), we held that "[o]nly when the record contains no evidence, regardless of how it is weighed, from which the trier of fact could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict."

■ Two of the counts charged Wilder with using a false social security number, in violation of 42 U.S.C. § 408(a)(7). This statute reads in relevant part:

> Whoever ... for the purpose of obtaining anything of value from any person, or for any other purpose ... with intent to deceive, falsely misrepresents a number to be the social security account number assigned by the Secretary to him or to another person, when in fact such number is not the social security account number assigned by the Secretary to him or to such other person ... shall be guilty of a felony.

There are three elements, (1) representation of a social security number, (2) with intent to deceive, and (3) falseness of the representation. Wilder argues that the government failed to prove the second element, intent.

Wilder describes the evidence of her intent to deceive as "sparse." For example, she provided a false social security number to Steel City Bank when she opened an account there and applied for a cash station card. But she argues that there is no evidence that the bank used the social security card in any way, either when it initially opened her account, or later when it froze her account. Nor did Wilder try to borrow any money from Steel City Bank. As she puts it, "[t]here was no evidence that the bank was in any way deceived by [her] actions." She argues further that "the mere use of a false number is not enough to convict."

To support this thesis, Wilder claims that in the reported cases the defendant was trying to defraud the party to whom the false social security number was given. For example Wilder notes that in *United States v. Kalagian*, 957 F.2d 527 (8th Cir.1992), the defendant used the false social security to obtain benefits to which she was not entitled and in *United States v. Shively*, 927 F.2d 804 (5th Cir.1991), the defendant used a false social security number when obtaining a loan to purchase a car.

Wilder is arguing in essence that the word "deceive" in the statute should be re-read as "deceive for pecuniary gain." But that is not what the statute says, nor what it means. It is not necessary for the government to show that Wilder misrepresented the social security number for pecuniary gain. In *United States v. Barel*, 939 F.2d 26, 32–34 (3rd Cir. 1991), the defendant was convicted with a showing that he supplied false social security numbers to several banks. There was no showing that he made any money doing so. Nonetheless, he had deceived the banks, and so he was convicted.

As *Barel* notes, "[t]he statute reaches misuse 'for *any* ... purpose.' 42 U.S.C.A. § 408(g) (emphasis added)." *Id.* at 33. *Barel*'s survey of the legislative history of the statute makes clear that it is a broad and inclusive prohibition against the misuse of social security numbers. *Barel* concluded that

> [t]he use of social security numbers as *badges of identity* in a great range of transactions in our modern society is so widespread that Congress included false use for any reason within the scope of acts prohibited under § 408(g) during that section's evolution into its present version.

Providing a false social security number to a bank for any purpose is proscribed by the statute. [Defendant's] deceitful use of [a false] social security number to open a bank account is within the "any other purposes" clause.

Wilder's attempt to limit the scope of the statute is rejected. Her argument, premised on that statutory reading, that there was insufficient evidence to convict her of illegally misrepresenting her social security number, is also rejected.

■ Wilder also argues that there was insufficient evidence to convict her of bank fraud. She argues that it was Grimes who committed the fraud on Harris Bank, and that the only "link" between her and Harris Bank was her connection with Grimes. She then argues that Grimes's testimony was the sole basis for proof of this "link." Wilder suggests that this "five or six lines of testimony without more" was an inadequate basis for the jury to find that she was guilty of the bank fraud.

Wilder is mistaken. The evidence was sufficient to support the jury's finding. Grimes testified clearly, however briefly, that Wilder was the instigator and planner of the scheme to defraud Harris Bank, and received part of the proceeds of the scheme. This testimony, if believed, was sufficient to convict her. Wilder's counsel cross-examined Grimes, and Wilder herself testified. The jury believed Grimes' story, not hers.

■ We do not reassess the credibility of witnesses. Such arguments are wasted on this court. *See United States v. Saunders,* 973 F.2d 1354, 1359–60 (7th Cir.1992), *United States v. Ruiz,* 932 F.2d 1174, 1178 (7th Cir.1991). The evidence was sufficient to convict Wilder of bank fraud.

**Jury Instruction**

■ Wilder also argues that the district court committed plain error by not giving a jury instruction regarding the admission of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Wilder did not tender an instruction, nor did she object to its absence, so she has waived any objection unless it can be shown to be plain error.

*United States v. Smith,* 995 F.2d 662, 672, n. 7 (7th Cir.1993).

■ Grimes testified regarding statements made to her by Wilder concerning their joint plans to negotiate the forged checks. Wilder points out correctly that there was no conspiracy charged, so these statements were not admissible under Rule 801(d)(2)(E). However, these statements were admitted not as co-conspirator statements, as Wilder argues, but as *admissions* governed by Rule 801(d)(2)(A). *See United States v. Curry,* 977 F.2d 1042 (7th Cir.1992) (admissions made by a co-conspirator before and after the conspiracy admitted not as co-conspirator statements, but as non-hearsay admissions of party opponent under Rule 801(d)(2)(A)).

The statements were admissible. The court made no error when it did not give an instruction regarding co-conspirator statements.

**Ineffective Assistance of Counsel**

■ Wilder argues that she received constitutionally ineffective assistance of counsel. She correctly notes that such a claim can be brought on direct appeal only if there is sufficient information in the record to support the claim. *United States v. Castillo,* 965 F.2d 238 (7th Cir.1992). However, as we have repeatedly said, such a course of action is nearly always the wrong one for an appellant because typically the trial record will be silent about the *reasons* for actions taken by trial counsel. *See, e.g., United States v. Davenport,* 986 F.2d 1047, 1050 (7th Cir.1993).

■ Defendant must do two things to establish ineffective assistance of counsel. First, specific acts or omissions must be shown in which the attorney's performance was less than objectively reasonable. Second, if the first showing is made, then appellant must further show that there was prejudice, or that there is a reasonable probability that but for the unreasonably deficient performance of the attorney there would have been a different result. *United States v. Penass,* 997 F.2d 1227, 1229 (7th Cir.1993). Furthermore, to satisfy the second prong defendant must show that the ineffectiveness of counsel "rendered the result unreliable or the proceeding fundamentally unfair." *Dur-*

*rive v. United States,* 4 F.3d 548 (7th Cir. 1993).

Wilder points out several apparent weak points in the performance of her trial counsel. She argues that these deficiencies, taken cumulatively, are sufficient to prove ineffective assistance of counsel.

For example, Wilder claims that her attorney's decision to put her on the witness stand was "not strategy, but suicide" because of the amount of Rule 404(b) impeaching evidence available to the government. Also, Wilder claims that when she was on the witness stand her counsel had her admit three of the four elements required to convict her of the social security counts.

Wilder's counsel also alerted the jury to facts which were harmful to her case. He published the guilty pleas of Wilder's co-defendants to the jury, and he commented within hearing of the jury that Sherman Brown, who was not called as a witness, would have said the same things that Claudette Grimes said, i.e. that Wilder was involved in the scheme. Finally, within hearing of the jury, her attorney corrected the spelling of Wilder's first name, which was misspelled "Dorris" by noting the spelling as "double r, as in robber."

■ Examining these alleged deficiencies, we see that Wilder has not met her burden. Her main charges, that trial counsel allowed her to take the stand, and that he chose to admit certain elements of the charged crime, are not objectively unreasonable. They were tactical decisions. Having Wilder testify may well have been her only hope of avoiding conviction, even given the existence of impeaching testimony. Wilder and her lawyer chose to run that gauntlet. They were unsuccessful, but it was not objectively unreasonable for them to try.

As to admitting certain elements of the alleged crime, if as here, it is futile to dispute them then it is not objectively unreasonable for defense counsel to save his arguments for the issues he has some hope of winning. As we stated in *United States v. Davenport,* 986 F.2d 1047, 1049 (7th Cir.1993), in criminal prosecutions "[c]ounsel examine the facts and winnow the issues, presenting for resolution by the court only those about which there is a fair basis for dispute.... Attorneys need not pursue every conceivable avenue; they are entitled to be selective." Wilder's counsel was selective. Had he contested the other elements, the government, as Wilder's appellate counsel suggests, may have made some error fatal to their case in presenting what were essentially uncontested issues. But trial counsel is not required to contest every element in the hope that he will get a lucky break.

■ The other defects in trial counsel's performance, while embarrassing after the fact, are the kind of mistakes which can occur in the heat of battle. They do not amount to objectively unreasonable conduct. The performance of Wilder's counsel involved more than the errors Wilder now raises. For example, he conducted a vigorous and lengthy cross-examination of Grimes which had a fighting chance of success, at least as far as one can tell from the cold record. Trial counsel's handling of Wilder's defense was not perfect, but it was not objectively unreasonable.

■ Even if it were objectively unreasonable, Wilder could not possibly get past the second prong of the test. There is very substantial evidence of Wilder's guilt, and there is no reason to conclude that a defense free of the alleged errors would have brought about a different result. Wilder's ineffective assistance of counsel claim fails.

## Restitution

Finally, Wilder argues that the district court abused its discretion when it ordered her to pay restitution. There are mandatory factors set forth in 18 U.S.C. § 3664(a) which the district court must consider before it may order restitution: (1) the amount of loss sustained by the victim, (2) the financial resources of the defendant, (3) the financial needs of the defendant and defendant's dependents, (4) the financial earning ability of the defendant and his dependents; and (5) other factors the court deems appropriate.

■ We will reverse a district court's restitution order if it is "not improbable" that the court failed to consider one or more of

these factors when deciding whether to order restitution. *United States v. Boula*, 997 F.2d 263, 267 (7th Cir.1993). However, the defendant must show that the district court abused its discretion in ordering restitution. *United States v. Helton*, 975 F.2d 430, 432 (7th Cir. 1992).

■■■ The presentence report notes that "based upon [Wilder's] financial information, it appears that [she] does not possess an ability to pay a fine or restitution." Nonetheless, the district court ordered Wilder to pay restitution in the amount of $129,840.46. It stated when doing so that restitution would "reduce the defendant's assets virtually to zero" implying that the court had considered Wilder's capacity to pay and found it to be roughly sufficient to pay the restitution. However, it appears from the financial information in the presentence report that Wilder had a net worth of $44,453.87—which included the stolen $86,000.00 previously frozen in her account with Steel City National Bank.

Wilder argues, convincingly, that the district court incorrectly determined how much money she actually had at the time of sentencing. But for the stolen $86,000.00 which had to be returned, it appears from the presentence report that Wilder had a negative net worth. Wilder did have some unencumbered assets amounting to $22,800.00 plus equity in her personal residence of $5,000.00. Nevertheless, this falls far short of the ordered restitution of $129,840.46. Given this discrepancy, it is "not improbable" that the district court did not accurately assess Wilder's financial resources.

■■■ If a district court "possesse[s] the necessary information" regarding the financial condition of a defendant, there is no abuse of discretion in ordering restitution— even where the defendant has a "negative networth and a monthly cash flow of zero." *United States v. Lesperance*, 25 F.3d 553, 558 (7th Cir.1994). In the case before us, however, it appears that the district court did not possess the necessary information about Wilder's financial condition.

Another aspect of Wilder's ability to pay restitution is her financial earning capacity. Wilder has a high school education and her

livelihood at the time of sentencing was based on the operation of a financial consulting business. In light of the nature of her offense it is not surprising that the district court ordered her not to offer financial advice for profit during the three years of supervised release after she completes her prison sentence. This order, which is otherwise unobjectionable, would seem to greatly diminish the chance that Wilder could earn enough money to make any substantial contribution toward payment of restitution on her release. In *United States v. Mahoney*, 859 F.2d 47, 51 (7th Cir.1988), a restitution order was vacated because of the defendant's manifest incapacity ever to earn the amount required for repayment. In *Lesperance*, although the defendant had a negative net worth and a zero cash flow, the court noted that he did "have some business interest to which he can return," thereby leading the court to believe that he could "make restitution over time as ordered by the district court." *Lesperance*, 25 F.3d at 558. Here, Wilder has specifically been forbidden to return to her business interests.

In regard to her making payments over time, the court may not require a defendant to continue making restitution once five years have elapsed following a defendant's release from incarceration. 18 U.S.C. § 3663(f)(2)(B). There is, thus, no continuing "lien" after five years with regard to the amount of restitution ordered. During the three-year period of supervised release the district court could hold the defendant in contempt or revoke or modify the terms of supervised release for failure to comply with the restitution order. 18 U.S.C. § 3663(g). However, before taking such action the court would be required to consider the defendant's employment status, earning ability, financial resources and the wilfulness of defendant's failure to pay. Again, considering the length of time involved and the defendant's earning ability and restrictions on employment, it would appear that the court would be hard pressed to enforce payment of restitution in the amount ordered.

In sum, the apparent misunderstanding regarding the amount of Wilder's assets at the time of sentencing together with the seeming

inability of Wilder to reasonably earn income sufficient to pay the restitution ordered, both lead us to conclude that the district court abused its discretion in ordering Wilder to pay restitution in the sum of $129,840.46.

**Conclusion**

Doris Johnson–Wilder's conviction and sentence of imprisonment are AFFIRMED; the imposition of restitution in the amount ordered is VACATED. The question of restitution is REMANDED to the district court for review consistent with this opinion and 18 U.S.C. § 3664.