*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0285p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
> *Plaintiff-Appellee,*

> *v.*

RONALD J. BOGART,
> *Defendant-Appellant.*

No. 07-3779

————————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-00164—Algenon L. Marbley, District Judge.

Argued: June 18, 2009

Decided and Filed: August 14, 2009

Before: KEITH, CLAY, and GIBBONS, Circuit Judges.

————————————

## COUNSEL

————————————

**ARGUED:** Frederick D. Benton, Jr., LAW OFFICE, Columbus, Ohio, for Appellant. Brenda S. Shoemaker, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee. **ON BRIEF:** Frederick D. Benton, Jr., LAW OFFICE, Columbus, Ohio, for Appellant. Brenda S. Shoemaker, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.

————————————

## OPINION

————————————

CLAY, Circuit Judge. Defendant Ronald J. Bogart appeals his sentence arising from his participation in a conspiracy to defraud numerous creditors of Richard Schultz. Pursuant to a plea agreement, Bogart pled guilty to three of the counts charged in the indictment: (1) conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343, conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341, both in violation of 18 U.S.C. § 371; (2) conspiracy to impair an Internal Revenue Service investigation in violation of 18 U.S.C.

1

§ 371; and (3) conspiracy to obstruct justice in violation of 18 U.S.C. §§ 1503 and 371.  As part of his sentence, the district court ordered Bogart to pay $2,492,424.66 in restitution jointly and severally with several other individuals convicted of participation in the conspiracy.  For the reasons that follow, we **AFFIRM** Bogart's sentence.

## BACKGROUND

### I.     FACTUAL BACKGROUND

This case arises from the efforts of Richard Schultz to conceal his assets from creditors, the United States government, and his ex-wife.

#### A.     The Conspiracy

As set forth in the second superseding indictment, in the mid-1980s, Schultz filed a lawsuit related to an investment in thoroughbred racehorses.  After he was unsuccessful, a California federal court entered judgments in favor of three of Schultz's creditors, totaling $5 million.  In response to the judgments, Schultz conspired with numerous individuals to avoid payment to the creditors.  The conspiracy sought to defraud Schultz's creditors by using third parties or "nominees" to purchase judgments against Schultz at a discount.  To purchase the judgments, the individuals involved in the conspiracy used various incorporated entities, including Judgment Acquisition Corporation ("JAC"), Judgment Procurement Corporation ("JPC"), Judgment Resolution Corporation ("JRC"), and Cedarwood Acquisition Corporation ("Cedarwood"), as nominees.  Bogart was among the individuals who controlled these entities at the direction of Schultz.  The third-party entities purchased the judgments with Schultz's funds that previously were concealed in offshore accounts.  Although Schultz was the true purchaser of the judgments, the nominees did not disclose to the creditors the nature of Schultz's interest.

#### B.     Bogart's Participation

On October 11, 1994, Bogart met with Schultz to assist Schultz in structuring a plan to "shield" Schultz's capital gains resulting from the sale of his stock in National Revenue Corporation.  As part of this plan, Bogart signed an agreement with Schultz to purchase stock in Kennedy Northern, Inc.  The agreement obligated Schultz to pay $2.5 million as a down payment on the stock, and to pay the remaining balance of $2.5 million within thirty

days. If Schultz failed to pay the balance within the required time, the agreement provided that Schultz would forfeit the $2.5 million down payment. However, Bogart and Schultz intended for Schultz to default on the obligation to pay the balance—and thus to forfeit the $2.5 million payment—in order to generate losses to offset Schultz's capital gains for tax purposes. The agreement also offered Schultz a "mechanism . . . to transfer his funds to offshore accounts in the Cayman Islands which became controlled by [Schultz] through his brother, Tom Schultz." (J.A. 312.)

In November 1994, Bogart entered into a similarly fraudulent agreement with Schultz's father to sell an office building, valued at almost $10 million, for $2 million. The agreement had terms similar to the transaction to purchase Kennedy Northern's stock—the failure to pay the balance within thirty days resulted in the forfeiture of a substantial down payment. "By April 1995, . . . Bogart had performed as Schultz required, transferring $4.3 million offshore to accounts controlled by Schultz, through [his brother, Tom], in the Cayman Islands." (J.A. 313.)

After assisting Schultz with these transactions, Bogart had no further involvement with Schultz until 1997. In May 1997, Bogart met with Schultz's brother, Tom. During the meeting, Bogart agreed to help Tom and Schultz conceal Schultz's ownership interest in the offshore funds, despite knowing that a grand jury was investigating Schultz's various transactions. To hide Schultz's ownership interest in these funds, Bogart incorporated Cedarwood to use as a nominee for the wire transfers. In August 1997, $380,000 was transferred from Schultz's Cayman Island accounts to Cedarwood. As directed by Schultz, Bogart used $327,000 to "purchase" a fifty-percent interest in JAC. Bogart also arranged for the transfer of $800,000 from the Cayman Island accounts, and $2 million from a bank account in London, to Cedarwood. Bogart then sent the funds to Frank McPeak, another co-conspirator, who purchased several judgments against Schultz through Cedarwood, JRC, and JAC. Bogart continued to participate in the conspiracy through April 2000, when he "made false statements in a deposition . . . . intended to mislead . . . Richard Kennedy's attorney, and to make it appear that the transactions . . . were legitimate transactions, not an attempt to conceal . . . Schultz's funds from his creditors." (J.A. 449.)

## II.    PROCEDURAL HISTORY

On January 30, 2003, a grand jury returned a thirty-two-count second superseding indictment charging Bogart, along with numerous co-defendants, with conspiracy to defraud the United States, money laundering, wire fraud, mail fraud, tax fraud, and criminal forfeiture. Relevant to Bogart's appeal, count one charged conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341, both in violation of 18 U.S.C. § 371. Count two charged conspiracy to defraud the United States Treasury in violation of 31 U.S.C. § 5314 and 26 U.S.C. § 7203. In addition, count thirty-two charged that Bogart and others committed conspiracy to obstruct justice in violation of 18 U.S.C. §§ 371 and 2.

On June 27, 2003, pursuant to a plea agreement, Bogart pled guilty to counts one, two, and thirty-two of the second superseding indictment in exchange for the government's agreement to dismiss the remaining counts in the indictment. Bogart stipulated in the plea agreement that, pursuant to 18 U.S.C. § 3663A, restitution was mandatory and agreed "to pay restitution to victims of the conspiracy to defraud the victims of Richard D. Schultz's conspiracy." (J.A. 197.)[1]

On June 18, 2004, the district court held a sentencing hearing and ordered Bogart to pay "restitution in the amount of $3,339,000 to the defrauded judgment holders." (J.A. 339.) At the conclusion of the hearing, the government sought "clarification" regarding the court's restitution order. (J.A. 341.) The government noted that Bogart's case was "wrapped up with the other actors who have varying levels of responsibility" and that "it may not be the most appropriate thing to [hold Bogart responsible for $3.4 million] after the Court considers the rest of the coconspirators." (J.A. 341.) Accordingly, the government recommended that the district court hold a restitution hearing within ninety days of the sentencing of the last co-defendant.

---

[1] Bogart's plea agreement also contained an appellate waiver provision under which Bogart agreed to waive "the right to appeal his sentence on any ground." (J.A. 196.) In its appellate brief filed six months prior to oral argument, the government addressed the merits of Bogart's claims on appeal and made no mention of the appellate waiver provision. Eight days before oral argument, however, the government filed a motion to dismiss Bogart's appeal, arguing for the first time that the appellate waiver provision in his plea agreement barred Bogart's appeal. In light of the government's failure to file the motion to dismiss until days before oral argument, we decline to rule on the government's motion seeking to dismiss Bogart's appeal, and instead address the merits of Bogart's appeal.

On July 13, 2004, the district court entered judgment, sentencing Bogart to an eighteen-month term of imprisonment, and ordering Bogart to pay $3,339,000. The order further provided that "[t]he restitution is to be paid jointly and severally with Richard Kennedy, Dominic Massari, Frances McPeak, Cedarwood Corp., [and] Martin Elson. The exact restitution amount each of these co-defendant's [sic] will pay will be determined at a hearing held at a later date pursuant to 18 U.S.C. § 3664(d)(5)." (J.A. 217.) Bogart subsequently filed a motion to modify the judgment, arguing that the restitution order was invalid because "until a hearing is convened to determine the exact portion of his liability it cannot be said that an order of restitution has been issued," and the deadline for issuing such an order had passed. (J.A. 221.)

On April 21, 2006, the district court held a restitution hearing with respect to all of the defendants involved in the conspiracy. In an extensive written order, the district court found Massari, Elson, Bogart, and Kennedy jointly and severally liable for $2,492,424.66 in restitution. With respect to Bogart, the district court ordered him to begin paying restitution on July 1, 2007, at a rate of $500 per month.

Following entry of the district court's restitution order, Bogart filed a timely notice of appeal. On appeal, Bogart argues that the district court's restitution order was invalid because it was untimely. He also contends that, based on his financial condition, the district court abused its discretion in ordering him to pay restitution. Finally, Bogart challenges the district court's decision not to apportion the restitution amount among the defendants based on their relative culpability.

## DISCUSSION

### I.      RESTITUTION ORDER

#### A.      Standard of Review

"The propriety and the amount of a restitution order are subject to different standards of review." *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006). Whether a restitution order is permitted under the law is subject to de novo review. *Id.* Once the court determines that a restitution order was permissible, the amount of

restitution ordered by the district court is reviewed for an abuse of discretion. *United States v. Vandeberg*, 201 F.3d 805, 812 (6th Cir. 2000).

### B.   Analysis

Bogart contends that the district court's restitution order is invalid under 18 U.S.C. § 3664(d)(5). Pursuant to the Mandatory Victims Restitution Act of 1996 (the "MVRA"), "[a]n order of restitution under [the MVRA] shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663A(d). Section 3664(d) offers "several procedural options for the court to obtain the evidence necessary to determine the amount of restitution." *United States v. Minneman*, 143 F.3d 274, 284 (7th Cir. 1998). Specifically, subsection (4) permits a district court, after reviewing the presentence investigation report, to "require additional documentation or hear testimony." 18 U.S.C. § 3664(d)(4). Under subsection (5):

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

18 U.S.C. § 3664(d)(5). Thus, § 3664(d)(5) "require[s] the sentencing court to resolve the restitution question—including any objections a defendant may have—within 90 days of the sentencing hearing." *Vandeberg*, 201 F.3d at 813. However, "the time limit was not created for the benefit of the convicted criminal, but to protect the victims of the crimes of which he has been convicted." *United States v. Terlingo*, 327 F.3d 216, 220 (3d Cir. 2003). "[T]he 90-day limit on the entry of a restitution order is more consistent with Congress's concerns about preventing the dissipation of a defendant's assets, than with protecting a defendant from a drawn-out sentencing process." *United States v. Stevens*, 211 F.3d 1, 4 n.2 (2d Cir. 2000).

The district court in this case sentenced Bogart on June 18, 2004. During the sentencing hearing, the court ordered Bogart "to pay restitution in the amount of $3,339,000 to the defrauded judgment holders. The restitution is to be paid jointly and severally with the codefendants." (J.A. 339.) At the conclusion of the sentencing

hearing, the government recommended "that pursuant to 18 U.S.C. 3664(d)(5), within 90 days *of the sentencing of the last defendant*, that we hold a restitution hearing . . . ." (J.A. 341) (emphasis added).**2**   The district court agreed with the government's suggestion, noting that "to the extent that we need to modify the sentence in this case, or in any of the other cases, we will do[] [s]o, but we will do so after the restitution hearing." (J.A. 342.)

On July 17, 2004, the district court entered judgment in Bogart's case. With respect to restitution, the judgment provided:

> The defendant shall make restitution to the following payees in the amounts listed below. The restitution is to be paid jointly and severally with Richard Kennedy, Dominic Massari, Frances McPeak, Cedarwood Corp., [and] Martin Elson. The exact restitution amount each of these co-defendant's [sic] will pay will be determined at a hearing held a later date pursuant to 18 U.S.C. §3664(d)(5) [sic].

(J.A. 217.) The judgment then listed St. Paul Fire & Insurance ("St. Paul"), Thomas Bourke, and Schultz's ex-wife among the victims to be paid restitution, and listed the total amount of restitution as $3,339,000. On April 21, 2006, the district court held a restitution hearing, and subsequently issued its final restitution order mandating that Bogart pay $2,492,424.66 in restitution jointly and severally with three co-defendants.

Because nearly two years elapsed between Bogart's sentencing and the district court's restitution order, the district court failed to make a "final determination" of Bogart's restitution obligation within ninety days of sentencing. Based on this failure, Bogart argues that the restitution order is invalid. The government appears to concede that the district court committed error in failing to determine the specific amount of restitution within ninety days of Bogart's sentencing hearing, but argues that the error was harmless.

---

**2**The presentence investigation report, issued September 13, 2003, made similar recommendations. The report noted that "[d]ue to various uncertainties in calculating the actual loss to the victims, the government anticipates that it will recommend to the Court that, within 90 days following sentencing *of the last defendant* in this matter, the Court hold a restitution hearing under 18 U.S.C. §3664(d)(5) [sic]." (J.A. 460) (emphasis added).

In addressing Bogart's arguments, we first consider whether the district court lacked authority to enter the restitution order in April 2006.  In *Vandeberg*, this Court held that "[§] 3664(d)(5) is not a jurisdictional statute."  201 F.3d at 814.  The court in *Vandeberg* specifically rejected the defendant's argument that "the [district] court lacked jurisdiction to [schedule conferences and conduct an evidentiary hearing to determine the victims' losses] after the 90-day period."  *Id.*  Despite this clear holding, a subsequent published opinion of this Court, *United States v. Jolivette*, 257 F.3d 581 (6th Cir. 2001), cast doubt on *Vandeberg*'s holding that § 3664(d)(5) does not deprive the district court of authority to address the issue of restitution beyond the ninety-day time limit.

In *Jolivette*, the panel addressed "whether the failure of the district court to set a final amount for the sentence of restitution rob[bed] the judgment of finality and deprive[d] this court of jurisdiction to hear the appeal."  *Id.* at 582-83.  The parties agreed that, although more than ninety days had passed since the sentencing hearing, the district court had not made a final determination of loss.  *Id.* at 583.  In concluding that the defendant's conviction and sentence were nonetheless final for purposes of appeal, the panel determined that "the restitution provision of the sentence is void, and the remainder of the sentence . . . is a final appealable order."  *Id.*

Although *Jolivette* involved a challenge to the finality rather than the validity of the district court's restitution order, in the course of justifying its conclusion that the defendant's sentence was final for purposes of appellate review, the court suggested that § 3664(d)(5) limits the authority of a district court to impose a restitution order beyond the ninety-day time period:

> [T]he statutory deadline for calculating the amount of restitution due has passed. . . .  Those time periods having passed, the district court could not now, consistent with the terms of the statute, set an amount of restitution. . . .
>     We believe that the statute makes clear the congressional intent to prohibit courts from making restitution determinations after the statutory period has run. . . .
>     Accordingly, we hold that when the 90-day clock runs out, the judgment of conviction and sentence, including the restitution provision,

becomes final by operation of the statute. We therefore have jurisdiction to review the judgment of conviction and sentence. It follows that because there was no timely judicial determination of the restitution amount, the judgment contains no enforceable restitution provision.

*Id.* at 584. The panel's conclusion in *Jolivette* implies that the district court's judgment ordering Bogart to pay $3,339,000 in restitution became final at the end of the ninety-day period, and that the district court subsequently lacked authority to set an amount of restitution.

To the extent that *Jolivette* is contrary to or in any way undermines this Court's conclusion in *Vandeberg* that the passing of the ninety-day time period does not deprive a district court of jurisdiction over a defendant's restitution proceedings, we conclude that *Vandeberg* controls. The court in *Jolivette* never cited to or discussed *Vandeberg*, a prior published opinion of this Court. *See United States v. Hardin*, 539 F.3d 404, 410 (6th Cir. 2008) (noting that "our circuit's rule that '[a] panel of this Court cannot overrule the decision of another panel' would mean that our prior holding . . . governs" notwithstanding an inconsistent view expressed by a later panel (alteration in original) (citation omitted)); *Sam & Ali, Inc. v. Ohio Dep't of Liquor Control*, 158 F.3d 397, 405 (6th Cir. 1998) ("No legal authority empowers this panel to reconsider, reverse, overrule, or modify the legal pronouncements of a prior published opinion of this [C]ircuit.").

Moreover, the *Jolivette* court discussed § 3664(d)(5) in the context of determining whether a district court's failure to set *any* restitution amount deprived this Court of jurisdiction over the appeal from the conviction and sentence. Thus, the court in *Jolivette* faced a possible jurisdictional defect in the defendant's sentence, and approached the issue as arising under the final judgment doctrine. In contrast, *Vandeberg* addressed whether the district court's revised restitution order was valid notwithstanding its entry beyond the ninety-day time period—the same question presented in this case. Accordingly, we follow *Vandeberg* and conclude that the district court's failure to comply with § 3664(d)(5) did not deprive it of jurisdiction to enter the April 2006 restitution order.

*Vandeberg* also makes clear that the district court's error in this case was harmless. In *Vandeberg*, the district court held a sentencing hearing on December 12, 1997, during which Vandeberg was ordered to pay restitution in the amount of $13,162.89. 201 F.3d at 809. Eighty-two days after sentencing, the "victim's losses had been ascertained," and the district court accordingly increased Vandeberg's restitution liability to $165,428.41. *Id.* Vandeberg subsequently filed a motion with the district court requesting a restitution hearing, which the district court granted. *Id.* The district court held the hearing on September 10, 1998, and, after considering the evidence from the hearing, reduced the amount of restitution to $100,000. *Id.*

On appeal, Vandeberg argued that the order requiring him to pay $100,000 in restitution was invalid because it was entered more than ninety days after his sentencing hearing. This Court held that the district court had erred in ordering the initial amount of restitution "[r]ather than deferring the issue" pursuant to § 3664, and had failed to provide Vandeberg with notice and an opportunity to be heard *within* the ninety-day period as § 3664(d)(5) required. *Id.* at 814. In addition, the court determined that the district court committed error "by failing to resolve the restitution amount . . . within 90 days after the sentencing hearing." *Id.* Despite the district court's numerous errors in determining the restitution portion of Vandeberg's sentence, the court upheld the restitution order, finding the errors harmless. *Id.* The panel reasoned that Vandeberg was afforded an opportunity to be heard regarding the restitution order at the subsequent hearing. *Id.* Thus, this Court found that the district court's restitution order of September 1998—issued almost one year after sentencing—was valid. *See id.*

Other circuits have reached similar conclusions. For example, in *United States v. Marks*, 530 F.3d 799 (9th Cir. 2008), the defendant argued that the district court's restitution order was "invalid because it was not entered until after the ninety-day statutory period." *Id.* at 803. The district court sentenced Marks on April 22, 2005, and, at the sentencing hearing, the government sought approximately $42,000 in restitution. *Id.* at 805. However, the government acknowledged that the restitution amount "could become less" because it had yet to confirm that certain individuals were, in fact, victims.

*Id.* at 804. In September 2005, the government submitted a proposed amended judgment ordering restitution in the amount of approximately $30,000. *Id.* at 805. On October 20, 2005, "well beyond ninety days after entry of judgment," the district court ordered the defendant to pay restitution in the amount of $30,000, and did not hold a hearing before entering the amended judgment. *Id.* The Ninth Circuit noted that it was "undisputed that the district court failed to comply with the ninety-day requirement of 18 U.S.C. § 3664(d)(5)[,]" but found that "the error was harmless because Marks has failed to demonstrate that he was prejudiced." *Id.* at 812.

Accordingly, we conclude that the district court's error in failing to comply with § 3664(d)(5) was harmless. As in *Vandeberg*, Bogart ultimately had the opportunity to be heard regarding his objections to the district court's conclusions about the victims who were entitled to restitution, as well as the restitution amount. At the hearing, Bogart had the opportunity to cross-examine witnesses who testified regarding their losses. Because Bogart has failed to show prejudice from the district court's delay in making a final determination of restitution, the district court's error is harmless. We therefore conclude that the district court's restitution order is valid.

## II.     RESTITUTION PAYMENT SCHEDULE

### A.     Standard of Review

Once we determine that the district court had authority to order restitution, we review the amount of restitution the district court ordered for abuse of discretion. *See Johnson*, 440 F.3d at 849.

### B.     Analysis

Bogart challenges two aspects of the district court's order requiring him to pay restitution jointly and severally with other convicted co-conspirators at a rate of $500 per month. First, he argues that the district court "abused its discretion by imposing an order of restitution upon [Bogart] who is indigent." (Def. Br. 18.) Second, Bogart argues that the district court improperly held him jointly and severally liable for the full restitution award because his specific conduct did not cause the victims' losses.

### 1.      Consideration of Bogart's Financial Circumstances

In his brief to this Court, Bogart contends that, "[i]n determining whether to order restitution," the district court should have considered his financial resources, his financial earning ability, and his financial obligations to his dependents. (*Id.*) However, the MVRA makes restitution mandatory regardless of a defendant's ability to pay. Section 3664 requires a district court to "order restitution to each victim in the full amount of each victim's losses as determined by the court *and without consideration of the economic circumstances of the defendant*."  18 U.S.C. § 3664(f)(1)(A) (emphasis added); *see United States v. Yaker*, 87 F. App'x 532, 534 (6th Cir. 2004) ("Nor was the court required to consider Yaker's ability to pay, because restitution under the MVRA is mandatory.").  A district court therefore may "consider ability to pay *only* when establishing the schedule of payment."  *United States v. Ellis*, 522 F.3d 737, 739 (7th Cir. 2008). Accordingly, contrary to Bogart's arguments, the district court was required to order Bogart to pay restitution.[3]

Bogart next argues that the district court abused its discretion in setting the restitution payment schedule.  Although a court cannot take into account the financial circumstances of a defendant in determining *whether* to award restitution, the statute provides that district courts must evaluate a defendant's ability to pay when establishing the manner and schedule of restitution payments.  *See* 18 U.S.C. § 3664(f)(2). Specifically, the MVRA directs district courts to consider "the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;" *id.* § 3664(f)(2)(A), "projected earnings and other income of the defendant; and" *id.* § 3664(f)(2)(B), "any financial obligations of the defendant; including obligations to any dependents," *id.* § 3664(f)(2)(C).  In addition, the statute sets forth

---

[3]Bogart cites to a case from the Seventh Circuit, *United States v. Loscalzo*, 18 F.3d 374 (7th Cir. 1994), in support of his argument.  *Loscalzo* was decided under the MVRA's predecessor statute, the Victim and Witness Protection Act, which did allow a district court to decline to award restitution if it determined that the defendant's financial condition precluded such an award.  However, Bogart was sentenced pursuant to the MVRA, which makes restitution mandatory regardless of a defendant's ability to pay.  18 U.S.C. § 3664(f)(1)(A).  Accordingly, *Loscalzo* does not support Bogart's argument.

numerous possible methods of payment, including a lump-sum payment, installments, periodic nominal amounts, or a combination of methods.  *See id.* § 3663(f)(3).

We conclude that the district court did not abuse its discretion in setting the payment schedule.  The district court fulfilled the requirements of § 3663(f)(2) by establishing a payment schedule in the restitution order, and by considering the factors set forth in the statute.  The district court stated that it had examined the financial statements that Bogart submitted to the court, and noted that it would "take into consideration the financial resources of the Defendants when setting the restitution payment schedule."  (J.A. 180.)  Also indicating the district court's consideration of Bogart's financial status is the reduced amount of Bogart's monthly payments as compared to his co-defendants.  In setting the restitution payment schedule, the district court ordered two of Bogart's co-defendants to pay $1,000 per month, and Bogart and a third codefendant to pay only $500 per month.

Moreover, while Bogart's financial statements submitted to the district court indicate that he had few financial resources at the time of the district court's restitution order,[4] a district court may consider a defendant's "education and entrepreneurial talents" and potential earning capacity in setting a restitution payment schedule.  *United States v. Viemont*, 91 F.3d 946, 951 (7th Cir. 1996); *see United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002) (finding no abuse of discretion where the district court, although recognizing the defendant's "present financial difficulties," "set payments at $500 per month as an amount that Booth might reasonably look forward to being able to pay").  In *Viemont*, the Seventh Circuit found that, even when a defendant has a

---

[4]The financial statements Bogart submitted to the district court disclose that, for June 2006, his net monthly salary was approximately $3,675.  For his necessary monthly cash outflows, Bogart stated that he spends $3,868, leaving him with a net monthly cash flow of $193.  With respect to "the prospective increase of the value of any cash inflows," Bogart noted that he was "just released" from prison and that therefore his "prospects [were] unknown."  (J.A. 470.)  In addition, Bogart reported that he had less than $200 in his checking account, and that he had filed for bankruptcy in Ontario, Canada, in January 2006.  The bankruptcy petition attached to his financial statement revealed that he had approximately $448,245 in debts.  Bogart also provided evidence of child support obligations.

The presentence investigation report found that Bogart's net worth was $78,222, and noted that Bogart "believes his business has the opportunity to significantly grow at some point in the future, which may increase his income.  It is currently suggested that the defendant's available resources be directed towards restitution."  (J.A. 458.)  The probation officer also found that Bogart "does have equity in his home, which could be utilized to pay restitution and/or a small fine."  (*Id.*)

"'negative net worth and a monthly cash flow of zero,'" 91 F.3d at 951 (quoting *United States v. Johnson-Wilder*, 29 F.3d 1100, 1106 (7th Cir. 1994)), a district court can set a restitution payment schedule "if 'there is some likelihood' that he will acquire sufficient resources in the future" *id.* (quoting *United States v. Simpson*, 8 F.3d 546, 551 (7th Cir. 1993)). The court in *Viemont* also noted that the defendant had demonstrated significant skill in carrying out the fraudulent scheme that had led to his conviction, indicating that the defendant had "strong potential to generate income." *Id.* at 951-52.

Similarly, this Court previously has relied on a defendant's education and future earning potential to uphold a district court's restitution payment schedule. In *United States v. Callan*, 22 F. App'x 434 (6th Cir. 2001), the court rejected the defendant's argument that he should be required to make only nominal payments because "neither his current economic circumstances nor those in the foreseeable future allowed for full restitution." *Id.* at 453. The court concluded that, "because [the defendant] has a college education . . . , his potential earning capacity" did not support a finding that he would be unable to make restitution payments. *Id.* In this case, Bogart possesses a bachelor's degree and previously earned a living as an accountant and as a businessman. His education and professional experience suggest that he once again could earn sufficient income to make the restitution payments even if, as counsel indicated at oral argument, Bogart lost his accountant's license. Further, the presentence investigation report noted that Bogart "believes his business has the opportunity to significantly grow . . . , which may increase his income." (J.A. 458.) Under these circumstances, the district court did not abuse its discretion in setting Bogart's payment schedule.

### 2.    Joint and Several Liability

Bogart also challenges the district court's order finding him jointly and severally liable for the full restitution amount. Specifically, Bogart argues that the "order fails to distinguish the relative culpability of each defendant while assuming they should be held equally responsible for the losses incurred." (Def. Br. 17.)

"In cases involving multiple defendants, § 3664(h) explicitly gives district courts discretion as to whether they should apply joint and several liability or whether liability

should be apportioned among the defendants based on their economic circumstances and their respective contributions to the victims' losses." *United States v. Hunt*, 521 F.3d 636, 649 (6th Cir. 2008). In this case, the district court determined that "[e]ach [d]efendant played a crucial role in the Schultz conspiracy—Defendants hid millions of dollars in Schultz's assets and erected legal barriers to prevent Schultz's creditors from enforcing judgments against him. . . . [A]s a result, there is no reasonable basis for apportionment." (J.A. 179.)

While Bogart argues that because his particular actions did not cause the victims' losses, he should not be held responsible for the restitution payment, this Court has rejected such an argument. In *United States v. Jamieson*, 427 F.3d 394 (6th Cir. 2005), the court disagreed with the defendant's argument that he could "only be ordered to pay restitution to victims 'directly harmed by [his] criminal conduct in the course of the . . . conspiracy.'" *Id.* at 418 (alterations and omissions in original); *see United States v. Collins*, 209 F.3d 1, 3 (1st Cir. 1999) ("In the context of a conspiracy, it is clear that a defendant is liable in restitution to all the victims of the reasonably foreseeable acts of his co-conspirators. No court has every held to the contrary."). Further, while the district court has the option under § 3664(h) to apportion the restitution payment among defendants, a district court is not required to do so. *See Booth*, 309 F.3d at 576 ("The court had the discretion to apportion the total, but was not required to do so."). Consequently, the district court did not abuse its discretion in holding Bogart jointly and severally liable for restitution to the victims of the conspiracy.

**CONCLUSION**

For the reasons set forth above, we **AFFIRM** Bogart's sentence.